(19 Misc. Rep. 443.)

GREATER NEW YORK ATHLETIC CLUB v. WURSTER, Mayor, et al.

(Supreme Court, Special Term, Kings County.    February, 1897.)

1. MUNICIPAL CORPORATIONS—POWER OF MAYOR—REVOCATION OF LICENSES.
   The mayor of Brooklyn has no authority to revoke the license of a place of public amusement; the charter (Laws 1888, c. 583) tit. 2, § 12, subd. 8, providing that the common council shall have power to prohibit or license and regulate such places, and an ordinance pursuant thereto providing that the mayor shall issue licenses, and giving him no power to either refuse or revoke a license.

2. SAME—POWERS OF COUNCIL—CHARTER PROVISIONS.
   A city council has no authority to provide for the revocation of licenses, where the charter gives no such power, but authorizes the enforcement of license ordinances by penalties provided therein.

Action by the Greater New York Athletic Club against Frederick *N*. Wurster, as mayor of the city of Brooklyn, and others, to restrain defendants from interfering with plaintiff's use of its building as a theater under a license.    Plaintiff moves for an injunction pendente lite.    Granted.

Almet F. Jenks, for the motion.
W. G. Cooke, opposed.

GAYNOR, J.    In accordance with the general ordinance of the city of Brooklyn for the granting of licenses, the building of the plaintiff was licensed as a theater by the city, through the mayor and city clerk, December 24, 1896; such license to expire the first Monday of next April.    It was not licensed for any particular shows or exhibitions, but was given a general theater license, and was thus put upon the same footing as every other theater in the city.    The license fee of $150 was paid, and the plaintiff, acting upon the license, went to large expense in fitting up the theater, and also bound itself in contracts to pay performers for future public entertainments in it.    Six days afterwards, viz. on December 30th, the mayor made and filed with the city clerk a formal instrument, in which he, in terms, revoked the said license, and directed the city clerk to cancel it.    Such instrument was made and filed without any hearing, or notice of hearing, to the plaintiff, and without returning the license fee, and assigns no reason for the mayor's action; and now the plaintiff is informed by the mayor that the

use of the said building as a theater will be forcibly interfered with and prevented by the city authorities. That the action of the mayor was arbitrary is stated, necessarily, in order to come face to face with the exact point of the controversy, viz. whether the mayor is by law vested with the arbitrary power which he claims. Had he the power to thus revoke the license? Has he the power which he claims, to revoke all city licenses, and not only close up theaters, but stop any licensed trade or occupation, at his mere will and pleasure? Centuries of recurring struggle, gradually made successful, by the Anglo-Saxon race against great and little interferences of government with the individual in his person, pursuits, home, and privacy, have made any exercise of arbitrary power contrary to the genius of our institutions, and so abhorrent to the fundamental ideas and principles of government upon which we have settled that in a given case the inquiry always is—First, whether such power has been expressly conferred by any statute; and, second, if it has, whether the legislature had power to confer it; for with us even the legislature is not supreme, our constitutions containing, as limitations upon legislative as well as upon executive power, those guaranties and safeguards to individual rights which in England were first extorted from the crown only as limitations upon the crown. I have carefully re-read the long collections of cases in our states concerning the licensing power as applied to trades and occupations lawful in themselves. 14 Alb. Law J. 422; 24 Alb. Law J. 84; In re Watson, 15 Fed. 514, note. From their incessant disagreements little is to be gathered, except that the theories and principles upon which alone such power can ever be justified have become obscured. It therefore seems necessary to go back to first principles, in the absence of controlling decisions in this state.

The power to interfere with occupations lawful in themselves, by means of license systems, has afforded such an easy way to official as well as political corruption and coercion that it ought to be kept within the strictest limits. The disclosures of a very recent legislative investigation are sufficient confirmation of this; and, in the case of the liquor traffic (a business not lawful in itself, however), it became necessary in this state to withdraw it from the license system. The general law of the state is freedom of the individual to carry on any kind of lawful business. His amenability to the criminal law has been found to suffice for the maintenance of the social order. If he conducts a circus or a theater or a store, and so on, he must take heed not to violate the criminal law against immorality, nuisances, and the like. When we come to cities, let it be remembered that this is still the law and order of things, unless express statute to the contrary be found. They "must show the power given them in every case." Dunham v. Village of Rochester, 5 Cow. 465; Dill. Mun. Corp. § 259. A general power given by the legislature to make ordinances relates only to the things over which the municipal corporation is given control by its charter. Village of Carthage v. Frederick, 122 N. Y. 268,

25 N. E. 480; Dill. Mun. Corp. § 251. Executive power to curtail or prohibit a business lawful in itself, even in the rare cases where, within that limited though undefined domain called the "general police power of the state," such power may be given by the legislature at all, cannot be implied, but must be expressly given. The constitutional guaranties of the liberty and property of the individual include and protect his right to follow any business lawful in itself, and that right may be regulated and curtailed only when its free exercise would interfere with the comfort, welfare, or safety of society. Bertholf v. O'Reilly, 74 N. Y. 509; In re Jacobs, 98 N. Y. 98. Cities are creatures of the legislature, and have no power of local legislation, viz. to make by-laws or ordinances, except in so far as the legislature has conferred it, either generally or specifically. Hence it is that we usually find a number of occupations and businesses which the legislature authorizes the regulation of by city ordinances, conferring at the same time, in aid of such regulation, the power to require the taking out of licenses as a prerequisite to engaging in them. Such license systems are not created, however, upon the assumption that general power exists in the legislature to curtail or prohibit at will trades and occupations lawful in themselves, or to confer power upon municipal corporations to do the like, either directly or indirectly, viz. by requiring them to be licensed in order to be conducted, and then refusing licenses. And no such legislative purpose exists in the creation of such license systems. On the contrary, the requirement of licenses for certain trades and occupations lawful in themselves is allowed by the legislature either for the purpose of taxation, pure and simple, or else to be used as a convenient means of enabling the city authorities to keep a record of them, in order to subject them to such public supervision as may be necessary for the general good in large communities, and that breaches of laws and ordinances relative to them may be watched for by the police, and prevented or punished, or for both purposes combined.

These fundamental principles recall to mind that the power, and also the intention, to interfere with a right of individuals to engage in any trade or business lawful in itself, is circumscribed and rare indeed, and that a legislative grant of power to regulate such a trade or business, and, to that end, to require it to be licensed, does not carry with it power to prohibit every or any person from engaging in it. Without them in mind, the present case, more far-reaching than a court is often called upon to decide, could not be well solved.

1. To ascertain what power the mayor has in the premises, we have to turn to the charter of Brooklyn (chapter 583, Laws 1888), and the ordinances passed thereunder. Section 12 of title 2 of the charter provides, in so many words, that "the common council shall have power within said city to make * * * ordinances, rules, regulations and by-laws, not inconsistent with this act or with the constitution or laws of the United States, or of this state," for various specified purposes,—among others "to regulate and license"

certain enumerated occupations and businesses, and also, separately stated (subdivision 8), "to prohibit or regulate and license all places of public amusement." It needs to be noted that the legislature has given this power, not to the mayor, but to the common council. The power to make ordinances to "regulate and license," but not to prohibit, is all that is given in respect of the said enumerated occupations and businesses; but, in respect of places of public amusement, the power given the common council is to make ordinances "to prohibit or regulate and license." The express conferring of power to prohibit in the latter case marks the intentional withholding of it in the former, and leaves no room for contention that it is impliedly conferred there, if that contention could ever be countenanced. The word "prohibit" is broad, but it cannot be held, under the constitution, that by it the legislature conferred power to prohibit all places of public amusement. Such was not the intention, but only that in the wise regulation of such places their number might possibly be limited. This limited power of prohibition may be constitutional and valid in the case of theaters and the like, while it might not be in the case of what, strictly speaking, we call "useful trades and occupations," which every person has the absolute right to engage in. But it is not necessary to dwell upon this, for, whatever may be the limit of the power to pass an ordinance to prohibit theaters, in the due regulation of them, which was thus conferred upon the common council, that body has passed no ordinance for their prohibition. It has chosen not to exercise such power. Nor could it delegate its power and discretion in the premises to the mayor, or to any other official. The legislature delegated the grave power in question to the common council, and it may be exercised by that body only. Thompson v. Schermerhorn, 6 N. Y. 92; Phelps v. Mayor, etc., 112 N. Y. 216, 19 N. E. 408; East St. Louis v. Wehrung, 50 Ill. 28; Dill. Mun. Corp. § 291. But the common council has not professed to delegate it to the mayor. It has done nothing at all in respect of exercising such power of prohibition, but has, on the contrary, included and classified the keeping of places of public amusement in one general licensing ordinance, with the said enumerated businesses which the legislature empowered it, as aforesaid, to "regulate and license" only, and thereby put it on the same footing with them in respect of being licensed. If any power to prohibit could be said to be contained in the said ordinance, it would have to be held that it is meant to relate alike to every occupation and business therein contained, while that could not be the case, as has been seen. But it contains no such power. Section 1 of the said ordinance is as follows:

"The following named persons or classes of persons are hereby required to be licensed, and licenses shall be granted to them by the mayor to carry on their respective trades or occupations, to wit: Coachmen, drivers of hacks, trucks, cabs, omnibuses, common carriers, carriers of passengers, common criers, hawkers, peddlers, pawn brokers, auctioneers, junkdealers, keepers of intelligence offices and slaughter houses, dealers and speculators in tickets to theatres or other places of public amusement, keepers of billiard saloons, bowling alleys, shooting

galleries, exhibitions of circuses, menageries and common shows, and owners and managers of theatres, opera halls, play houses and all other places of public amusement, also public expressmen, public cartmen and public truckmen."

This language betrays no intention of vesting any power of prohibition or any discretion in the mayor, if the common council could do so; and that official has no power or function in the premises, except such as this ordinance gives him. It will be even observed that its terms are mandatory to the mayor. He is not left free to refuse or to license whom he pleases. The persons and callings enumerated are "required to be licensed, and licenses shall be granted to them by the mayor"; and the next section of the ordinance enacts that "the licenses required to be granted by the foregoing section, shall be issued by the city clerk and signed by the mayor." If the word "may" were used, it might be held to mean "shall," as under that mild form positive duty may be imposed. Mayor, etc., v. Furze, 3 Hill, 612. But the word "shall" is always mandatory. It excludes the idea of discretion, when addressed to a public official. The mayor, therefore, instead of possessing the sweeping power of refusing licenses and of revoking licenses, and forfeiting the fees paid therefor, without notice or hearing, at his mere pleasure, and of thus prohibiting individuals from engaging in callings and occupations covered by the license system of Brooklyn, is not given any power or discretion in the matter whatever, even if the common council be able to give him any. I have not overlooked the Schwab Case, 126 N. Y. 473, 27 N. E. 964. It has no application. There the legislature conferred the power to license auctioneers directly upon the mayor, and the court felt constrained to construe the language of the act as vesting in the mayor an absolute discretion to grant or refuse such licenses, as he should think best; and, for reasons which it assigns, it held that the legislature had the power to so provide in the case of auctioneers. The court evidently deemed the case an extreme one, and sought reasons for its justification.

2. But the learned counsel for the city calls attention to an old ordinance of the city, under which he insists that the mayor has the power claimed. It is as follows:

"The mayor shall grant licenses for the purposes authorized by section 13 of title 2 of the city charter ✻ ✻ ✻ to such residents of the city of the age of 21, duly qualified according to the ordinances of the common council, as he may deem proper, unless the common council shall otherwise designate, and may revoke the same at pleasure."

It would be enough to say that this ordinance was passed during the existence of the charter of 1854, and referred only to subdivision 4 of the said section of it, which provided that authority to grant licenses for the ordinary callings therein specified might be given by the common council to the mayor, and that places of public amusement were not included therein, and that, if it is still in life, it can have no further scope now. If this construction be questioned, it is to be said further that the said authority in the charter of 1854 to the common council to devolve licensing power upon the mayor does not now exist, having been left out of the

charter of 1873 and the present charter. Furthermore, and for that reason, a later licensing ordinance was passed, viz. the one first cited above; and reference to it will show that it covers the whole subject of licensing, and makes a complete system, thereby superseding and repealing all prior ordinances upon the subject. Town of Decorah v. Dunstan, 38 Iowa, 96.

3. If this old ordinance could be considered unrepealed, or as revived by reason of being included in the codification of ordinances recently adopted by the common council, then it must be declared void; for the charter of 1854 contained no grant of power to revoke or forfeit licenses, or to provide therefor by ordinance, or to confer such power upon the mayor. The same was the case with the charter of 1873, and is also with the present charter. The only method allowed for enforcing license ordinances, as all others, was and is by penalties to be prescribed therein. Section 16, tit. 2, Charter 1854; section 15, tit. 2, Charter 1873; section 14, tit. 2, Charter 1888. No other method, therefore, can be adopted, the prescribed one being exclusive. Dill. Mun. Corp. § 280; Hart v. Mayor, etc., of Albany, 9 Wend. 571. And allied with this principle, and as has already been seen, an act of the legislature, in order to curtail to any extent the right of the individual to engage in any business lawful in itself, or use his property for any lawful purpose, must expressly so provide, and would have to be clearly justified upon the score of necessity to the public comfort, welfare, or safety, in order to be valid. In the present case the mayor's action not only forfeits the license, and prevents the plaintiff from using its building for a theater, but also forfeits the $150 which it paid for the license; and all without a hearing. The license, being granted and accepted subject to no such power of revocation, was property, and could not be forfeited except by due process of law, —an essential of which is a hearing. Dill. Mun. Corp. § 280; Stuart v. Palmer, 74 N. Y. 183.

4. The learned counsel for the city contended in favor of the said ordinance for the arbitrary revocation of licenses by the mayor, at his pleasure, on the ground that such summary government was proper and customary in cities, and had legal sanction, and read as evidence thereof section 25 of title 11 of the city charter, which lays it down as the duty of the police to arrest, "with or without warrant," all persons guilty of violating any law or ordinance. The meaning attributed to this is that policemen in the city of Brooklyn have the extraordinary and oppressive power of making arrests for the lesser offenses, called "misdemeanors," without warrant, though not committed in their view. But this charter provision gives no such power. It easily bears an interpretation in harmony with the common law, the general statute law, and the bill of rights (1 Rev. St. c. 4, § 11), which forbid such arrests and seizures. To arrest "with or without warrant," as this provision says, means with warrant where warrant is required by law, and without warrant only where it is not so required. Every citizen has the right to arrest for a misdemeanor committed in his presence. While

that is the "right" of every citizen, it is made the "duty" of every policeman. It is only in the case of persons guilty of felonies that citizens and policemen alike have the right to arrest without warrant, though they did not see the crime committed. Code Cr. Proc. §§ 177, 183. No one may be arrested for a misdemeanor without a warrant duly obtained upon proof, except he be taken in the act, when he must be forthwith taken before a magistrate by his captor, and accused. Such is the law of the Anglo-Saxon race, and, where it is not followed, Anglo-Saxon government cannot be said to exist. It did not arise out of accident, but from sore experience. No one acquainted with the history of the guaranties to individual liberty, and the long struggles of the people to obtain them, can see them infringed without a feeling of resentment. Interpretations like that put upon this charter provision are responsible, in some of our large cities, for many unlawful acts by police authorities, like trespasses into houses, unlawful interferences with persons on the streets, and in matters involving no criminal offense, the holding of persons by force to be vaccinated, and gross invasions of privacy, sometimes to the general annoyance and scandal of the community. Much is to be feared from diseases and vices, but infinitely more from the growth of arbitrary power than from all diseases and vices combined. While one unlawful arrest or interference may do some good, one hundred others will do infinite harm.

5. The foregoing reference to the power of arrest was extended, to some extent, because of its applicability to what is to be said in conclusion. It appears that the license was revoked upon a report of a police captain that a boxing bout was held in this theater. He did not report that any violation of criminal law occurred, and he was present throughout and made no arrest. If a criminal offense was committed, it was the duty of the captain to have arrested all concerned in it upon the spot, and his failure to do so was a breach of duty for which he could be removed from his office. Charter, tit. 11, § 15. He needed no warrant, the offense being committed in his presence. Let it then be understood that, in granting an injunction herein against preventing the use of this theater, this court is not preventing the police or the government of Brooklyn from preventing violations of law therein, or making arrests therefor. If a prize fight, or any indecency, or anything violating the criminal law, be brought on in this theater, it is the same as though it were in any other theater, viz. it is the right of any citizen and the duty of any policeman present to then and there arrest every one participating in the offense. Executive government would be nerveless and impotent indeed which could not easily deal with such matters without any resort to doubtful power.

Let the injunction be granted.