(117 App. Div. 856)

PEOPLE ex rel. LODES v. DEPARTMENT OF HEALTH OF THE CITY OF NEW YORK.

(Supreme Court, Appellate Division, Second Department. March 15, 1907.)

1. MUNICIPAL CORPORATIONS—POLICE POWER—PUBLIC HEALTH—REVOCATION OF PERMITS.

The department of health of a city has no authority to revoke permits to carry on the business of selling milk at retail on conviction of selling milk which was below the standard fixed by the Sanitary Code, in the absence of an ordinance or regulation of the board, authorizing the revocation for that cause, and the custom of the board to that effect is not equivalent to an ordinance.

2. SAME.

The department of health of a city cannot revoke a permit to carry on the business of selling milk at retail on conviction of selling milk below the standard fixed by the Sanitary Code, without notice and a hearing.

Appeal from Special Term, Kings County.

Application by the people, on the relation of George Lodes, for mandamus to the department of health of the city of New York. From an order allowing a peremptory writ of mandamus, requiring the board of health to rescind its summary order revoking, without notice or hearing, permits to the relator to carry on the business of selling milk at retail at his place of business and by wagon in the city, under which his permits were physically taken from his possession by a policeman by order of the board, defendant appeals. Affirmed.

See 100 N. Y. Supp. 788.

Argued before HIRSCHBERG, P. J., and WOODWARD, JENKS, HOOKER, and GAYNOR, JJ.

Edward H. Wilson (James D. Bell, on the brief), for appellant.
Albert R. Moore, for respondent.

GAYNOR, J. What is called the Sanitary Code of the city of New York is made up of health ordinances adopted from time to time during a course of years by its board of health (Laws of 1873, p. 506, c. 335, § 82); and the charter of the new city enacted that this Code, to the extent that it was then "in force," was and should continue to be binding and in force in the new city. Laws 1897, p. 1, c. 378, and of 1901, p. 499, c. 466, § 1172. Any violation thereof is made a misdemeanor by the said charter section. Section 56 of the said Sanitary Code is as follows:

"No milk shall be received, held, kept, offered for sale or delivered in the city of New York without a permit from the board of health and subject to the conditions thereof."

The revocation of the relator's permits, and the refusal to permit
him to sell milk thereafter, was on the ground that he and some of
those who work for him were convicted in a criminal court of selling
milk which was below the standard fixed by another section of this
Sanitary Code; and the opposition to the granting of the writ is put
on that ground alone; i. e., that the board of health has the power
to disqualify a person from selling milk for his conviction in a crim-
inal court of a violation of its ordinances fixing the standard of pure
milk.

The precise question presented is, therefore, has the board of health
power to revoke the license of a milk vendor for his being convicted
in a criminal court of the offense of selling adulterated milk, and
thereby and by refusing him a license thereafter inflict on him a for-
feiture of the right or a penalty of disqualification to carry on that
business.

1. I suppose it is within the power of the state Legislature to pass
an act to disqualify one to continue in a particular business, and to
revoke his license therefor, as a penalty for his subsequent conviction
of a violation of any law or ordinance regulating such business, as is
done, for instance, in the statute for the licensing of master plumb-
ers (Laws 1892, p. 1152, c. 602, § 13); or, it may be, enabling a munic-
ipal common council or other competent body to pass an act (call it ordi-
nance, by-law or rule, as you will, for there is nothing in the name)
to the same effect. It suffices that there is no such disqualifying act,
state or local, in this case. Another section of this code of sanitary
ordinances fixes the standard of milk to be sold, and the punishment
prescribed by the Legislature for a violation thereof is, as we have
seen, the general one for a misdemeanor; i. e., a fine not exceeding
$500, or imprisonment not exceeding one year, or both (Pen. Code,
§ 15.) The board of health has prescribed no punishment; nor has any
municipal authority. No penalty or sanction for the enforcement of
ordinances can be resorted to except those previously prescribed by
statute, or by a local ordinance authorized by statute. Hart v. Mayor,
etc., 9 Wend. 571, 24 Am. Dec. 165; Athletic Club v. Wurster, 19
Misc. Rep. 443, 43 N. Y. Supp. 703; Dillon on Munic. Cor. (4th Ed.)
§§ 280, 346.

(a) It is not necessary to now say whether the board of health has
been given power by the Legislature to enact an ordinance prescribing
such penalty of disqualification upon such conviction, and, if so, wheth-
er such grant of power be valid. It suffices that no such ordinance
exists. It should not escape notice in passing, however, that the said
charter section 1172 empowers such board to "provide for the enforce-
ment of the said Sanitary Code by such fines, penalties, forfeitures or
imprisonment as may by ordinance be prescribed." If this language
had to be construed as purporting to give the board unrestricted pow-
er to prescribe punishments of the nature mentioned, it would mean
that such board could prescribe the forfeiture of one's estate as well
as of his occupation, and any length of imprisonment or weight of
fine, if the Legislature be capable of delegating such transcendent pow-
ers of sovereignty. But it expresses no such legislative intention, for
it expressly limits such punishments to such "as may by ordinance be

prescribed"; i. e., to such as there is power to prescribe by ordinance; and apart from the Legislature's power of delegation, the charter, as we have seen, sets limits to ordinance making on that head by making the offense of violating the said sanitary code a misdemeanor.

It has been suggested that there is such an ordinance (or "rule," as it is called, and that name is just as good if there be any who prefer it). This is based on an allegation in an affidavit read in opposition below, that "it is the practice of the board of health" to revoke the permits of persons twice convicted of selling adulterated milk, and to refuse permits to them thereafter, and that the board followed "this rule" in the present case. But the ordinances of the board of health have to be in writing and published like all statutes. Section 1172, supra. There is no pretence that there is any such written "rule," by-law or ordinance. As to the "practice" of inflicting the penalty of disqualification, that is the very thing objected to as a usurpation of power.

(b) Nor may we consider whether the Legislature may empower the board of health to revoke such a permit for cause after a hearing by it on notice, with or without a conviction in a criminal court, and by that fact disqualify the holder, for no such power has been conferred; or empower it to pass an ordinance for such revocation and disqualification by it after such notice and hearing, or without that judicial formality, for there is no such ordinance. But the subject cannot be even cursorily considered without remembering that either by the framework or the express words of the instruments constituting government throughout this country, government is divided into the three branches, legislative, executive and judicial, and the powers of government divided among these three branches according to their kind. To assign to an executive official or board the power to both make laws and judicially try and punish persons for their violation would therefore raise a most grave question. Nowhere is the fundamental principle of government that the powers of government, or of any two of the departments of government, cannot be united in any one department, better expressed than by this section of the Massachusetts Bill of Rights, viz.:

"In the go.....nment of this commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end it may be a government of laws and not of men."

(c) Such an ordinance, or state statute, would have to "require" a hearing on notice to be valid, for the right to follow any of the ordinary occupations of life is protected by the constitutional right of liberty and property, and therefore cannot be taken away except by judicial process, an essential ingredient of which is a requirement of a notice of trial. Stuart v. Palmer, 74 N. Y. 183, 30 Am. Rep. 289.

2. It follows that inasmuch as the board of health had no power to inflict such forfeiture and disqualification as a punishment, it had no power to inflict it at all; unless, as is claimed, the bare power of the Legislature to the board of health to require a permit or license from

it to sell milk, which is all that its said ordinance in terms does, carries with it inherently to the said board the power to arbitrarily refuse such permit to whom it will, and thereby prohibit such business to whom it will; and that therefore a license or permit which might have been refused at will by such board in the first instance may be permanently revoked by it at will. Now, if the Legislature has no power to directly prescribe that such license or permit may be granted or refused at will, it cannot be said that such power inheres in its grant of power to such board to require such license or permit; and thus the question whether the Legislature has such power is presented. If it has it not, then the board of health cannot have it.

Is it then indeed so that in this free government, saturated from the beginning with the very sap and juice of liberty, to borrow a phrase from a great constitutional writer (De Lolme on Brit. Const. [1853 Ed.] p. 20), we have already relapsed to that degree of arbitrary power that one may not engage in the usual and necessary occupations of life, the selling of milk, butter, eggs, butcher's meat, fish, tea, coffee, vegetables, fruit, and so on (for they are all within the same principle and category), as matter of right, but only, as is the case in the few despotisms which still survive in the world, by the consent of government as matter of grace—such consent being revocable at will inasmuch as it may be refused at will? The making of such an assertion anywhere in the Anglo-Saxon world, ever an irritab'e body on questions of the rights of the individual, arouses instant challenge, for it strikes at the foundation of free government. The final judicial decision in this country in which such a claim shall be for the first time upheld will be momentous. It will mark the year in our history when free government had run its course with us and the decline to government paternalism or despotism, which cost past ages so much of blood and property to get rid of, set in. The learning and wide research of counsel have not been able to discover any actual decision which, read with true discrimination and application, supports such a claim. If there is to be such a precedent, we must make it this day.

(a) The ordinary useful and necessary occupations of life—the usual occupations and businesses of citizens generally—are free to all men as of right, and may not be prohibited to any one who chooses to engage in them even by the Legislature, let alone by the executive or the judicial branch of government. They may only be regulated, which is a very different thing, and that only by the Legislature directly, or through power conferred by it. Such power to regulate them exists where the safety, welfare or necessary comfort of society requires such regulation. The power of prohibition exists only in the case of occupations not included among such free and lawful ones. And what cannot be done directly cannot be done indirectly; i. e., by requiring such free and lawful occupations to be licensed in order to be carried on and then allowing licenses to be refused at will or revoked at will. The constitutional guarantees of the rights of liberty and property to the individual include his right to follow any ordinary and usual business until he loses or forfeits it by due process of law. Bertholf v. O'Reilly, 74 N. Y. 509, 30 Am. Rep. 323; Matter of Jacobs, 98

N. Y. 98, 50 Am. Rep. 636; People v. Marx, 99 N. Y. 377, 2 N. E 29, 52 Am. Rep. 34.

(b) It does not help the contention to the contrary to say that the power of executive officials to refuse or revoke such a license at will must be exercised reasonably, and is subject in that respect to judicial review.    If that were so we should have the same case still, for the Legislature can no more confer such power on the judicial than on the executive branch of government.    The courts must not forget that arbitrary power is not made lawful, although they may flatter themselves that it is made lenient or benevolent, by being subjected to their review in its exercise.

(c) You may not build a house in a city, or deliver building material to your lot, or connect your house plumbing with the water main in the street, and so on through a list of things; without a permit or license; and yet no one will say upon second thought that such a license may be refused to you at will.    If you comply with all reasonable requirements or regulations prescribed as conditions precedent you are entitled to it.    These are simple instances, it is true, but the present case, once understood, is equally plain.    We have before us an occupation which may not be arbitrarily prohibited, but may only be regulated by the Legislature or by its authority by reasonable conditions and requirements, and which may be subjected to a permit or license to that end and to that extent only, and not for the purpose of prohibition at all.

(d) The matter is one in which it is difficult to get astray if a certain distinction be kept in mind and easy to get astray if it be not. There are occupations which are not and never have been free, such as the sale of intoxicating drink, the storage of explosives, the slaughter of cattle, public shows or plays; such as cause great noise or vile odors; those of common carrier, mail carrier, innkeeper, auctioneer, public hackman, public wharfinger, public warehouseman within limits, and the like, who have public duties to perform, and "exercise a sort of public office," as the cases say (New Jersey Nav. Co. v. Merchants' Bank, 6 How. [U. S.] p. 382, 12 L. Ed. 465); because the safety, welfare and essential comfort of society forbid that they should be. Such occupations are inherently dangerous or annoying to the community; or else are affected with a public interest, or pertain to the public service or a public use, and are therefore of the nature of privileges instead of rights.    Some of them may be prohibited altogether, some within certain territorial limits, and others beyond a limited number, under the police power of the state, which arises from and rests on the community right of self protection and self preservation. Reference to a list of cases in illustration may not be attributed to the overgrown habit of citation when it is possible for such a momentous question to arise in our free government as is presented by this case.    Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205; Crowley v. Christensen, 137 U. S. 86, 11 Sup. Ct. 13, 34 L. Ed. 620; Wilson v. Eureka City, 173 U. S. 32, 19 Sup. Ct. 317, 43 L. Ed. 603; Gundling v. Chicago, 177 U. S. 183, 20 Sup. Ct. 633, 44 L. Ed. 725; Fischer v. St. Louis,

194 U. S. 361, 24 Sup. Ct. 673, 48 L. Ed. 1018; California Reduction Co. v. Sanitary Reduction Works, 199 U. S. 306, 26 Sup. Ct. 100, 50 L. Ed. 204; Slaughter House Cases, 16 Wall. 36, 21 L. Ed. 394; City of Brooklyn v. Breslin, 57 N. Y. 591; Cronin v. People, 82 N. Y. 318, 37 Am. Rep. 564; People ex rel. Oak Hill Cemetery Ass'n v. Pratt, 129 N. Y. 68, 29 N. E. 7; People v. Ewer, 141 N. Y. 129, 36 N. E. 4, 25 L. R. A. 794, 38 Am. St. Rep. 788; Matter of O'Rourke, 9 Misc. Rep. 564, 30 N. Y. Supp. 375.

These prohibitable occupations should not be confused with the multitude of free and lawful occupations which cannot be prohibited, but may in some cases be regulated for like reasons of the general safety, welfare and comfort. No one would think of assigning the sale of milk or any of the other ancient and ordinary occupations of life, like those already enumerated, to the former class. They cannot be prohibited as inherently noxious to society, for they are not; nor restricted to a limited number for the general welfare, for the general welfare does not require it, but the contrary, in order that the economic laws of trade and prices may not be dislocated or thwarted; or for pertaining to the public service or a public use, or as affected with a public interest, for they are not of that class; but they may be subjected to regulation, and in cases of occupations requiring for the safety of the community scientific skill, or special knowledge, or even moral excellence, such as that of master plumber, engineer, physician, and the like, to regulation in respect of such qualifications, according to the case; all of such regulations, however, to be applicable to all persons alike, so that no one be discriminated against nor arbitrarily excluded; for our system of government was constructed on an abhorrence of arbitrary power as its corner stone. Barbier v. Connolly, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923; Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220; Hawker v. New York, 170 U. S. 189, 18 Sup. Ct. 573, 42 L. Ed. 1002; Plumley v. Massachusetts, 155 U. S. 461, 15 Sup. Ct. 154, 39 L. Ed. 223; Schellenberger v. Pennsylvania, 171 U. S. 1, 18 Sup. Ct. 757, 43 L. Ed. 49; Collins v. New Hampshire, 171 U. S. 30, 18 Sup. Ct. 768, 43 L. Ed. 60; Capital City Dairy Co. v. Ohio, 183 U. S. 238, 22 Sup. Ct. 120, 46 L. Ed. 171; Dobbins v. Los Angeles, 195 U. S. 223, 25 Sup. Ct. 18, 49 L. Ed. 169; People v. Marx, 99 N. Y. 377, 2 N. E. 29; People v. Gillson, 109 N. Y. 389, 17 N. E. 343, 4 Am. St. Rep. 465; City of Buffalo v. Collins Baking Co., 39 App. Div. 432, 57 N. Y. Supp. 347; People ex rel. Schwab v. Grant, 126 N. Y. 473, 27 N. E. 964; People ex rel. Nechamous v. Warden, 144 N. Y. 529, 39 N. E. 686, 27 L. R. A. 718.

(e) And such regulation is invariably effected by means of the requirement of licenses or permits to engage in such occupations, that being, however, only a means of affording notice to the public authorities of all persons who do so, in order to enable them to exact the reasonable qualifications or conditions imposed, and thereafter make the necessary inspections to enforce the regulating ordinances or laws by criminal prosecutions, or the collection of the penalties prescribed or allowed to be prescribed by statute, or in any other lawful way.

(f) There are thus two distinct systems of licensing which must not be confused together, (1) the one of occupations which may be prohibited by the Legislature altogether, and therefore by dispensing power tolerated and allowed to many or to a few, as the Legislature may see fit, and of occupations that may be prohibited by it partly, viz., in a locality, or in excess of a limited number; and (2) the other of occupations that may not be prohibited at all, and which is wholly for the purpose of regulation. In the same way licenses of free and lawful occupations are resorted to for taxation, and no one may be refused a license who tenders the tax. To enter upon a consideration of this subject without this distinction in mind would be like putting to sea in a rudderless ship.

(g) If our executive officers could arbitrarily restrict the number of persons to carry on the ordinary and necessary vocations of life, and select such persons, the exalted conception of our government as one of laws and not of men would be at an end. And even if our Legislatures could do the like, or empower executive officers to do it, how long would it be before such power would be made the means of the gross official extortion which we know from the world's experience to be inseparable from arbitrary power or paternalism in government? Such power in executive or administrative officers in this state in respect of licensing the liquor traffic was used for that purpose to such an extent that all discretion in granting such licenses had finally to be taken away. Those who meditate a recourse to arbitrary power for a good purpose should pause to consider the consequences, for it is a vice which brings in its train all of the vices, and especially the detestable vices of official extortion and blackmail. Good men in good times should beware of setting bad precedents for bad men in bad times  The sale of impure milk or other food is bad, but far worse, and fraught with far greater evils, would be the growing exercise by executive officials of powers not conferred on them by law  If they were suffered to require licenses for the ordinary occupations of life. and refuse them to whom they willed, how long would it be before such licenses would be sold for money, or for political favor or partisan fidelity? And what would be the effect on the price of milk—and on its purity also? The answer is in every mind; both would be debauched. Ample lawful powers may be exercised by the Legislature and the board of health to prevent the evil of impure milk. The exercise of arbitrary power would·not only fail of that result, but would be attended by immeasurably worse evils.

3. If the foregoing contention were not true, namely, that the Legislature has not the power to arbitrarily prohibit the ordinary useful and necessary occupations of life or to confer power to do so, to say that the mere power given to a board of health by the Legislature to impose the requirement of a license for them implies and carries with it power to revoke such a license at will, would still be erroneous as against the rule that official powers may be conferred by statute only by express words or necessary implication. It was never true even of licenses to sell intoxicating drinks as we all know. The power of licensing boards or officers or of courts to revoke such li-

censes depends wholly on whether and to what extent the Legislature has conferred it    We are all too familiar with that phase of our present excise statute, and of the system of excise statutes which existed in this state from the beginning up to the time of its adoption, to make it necessary to enter upon a discussion of the subject.    That no power to revoke such a license existed or now exists except by being given by statute will be disputed by no one.    The notion that power to executive or administrative officials to grant a license carries with it inherently power to revoke is a novel one.

4. The argument that the board of health may not be deemed restricted to the enforcement of the punishment prescribed by statute, or by its own lawful ordinances, for the violation of its ordinances, because that would leave it possible for an offender to offend again even while being prosecuted for a prior offense, or after his conviction thereof, if his permit be not revoked, would be a strange one for a court to listen to, much less suggest, as showing that the board has the power to revoke.    No one could indulge in it without forgetting himself.    If the severe punishment of one year's imprisonment and $500 fine be not enough to secure obedience to the sanitary ordinances of the city of New York—an incredible pretence—and the board of health be without power to prescribe a severer one, that is a consideration to be addressed to the Legislature, not to the courts—nor to the executive department of government.

5. An examination of the argument or legal thesis which is opposed to the foregoing discloses, as it seems to me, the continual confusion and misapplication of what the Legislature has power to do with what executive or administrative officials may do.    The case of the latter always is, not what the Legislature may do, or empower them to do, but what it has done, or empowered them to do, and then whether they have acted within the power given.    It is worse than useless, for instance, because it is misleading, to cite cases like Doyle v. Continental Ins. Co., 94 U. S. 535, 24 L. Ed. 148, for the proposition that a license or permission is always revocable by the officials who grant it; because the question there decided was only that the state, the Legislature, may by statute make licenses revocable, and not that mere power to administrative or executive officials to license carries with it inherently power to them to refuse at will and revoke at will.    If the Secretary of State had assumed to revoke in that case without any legislative authority, then the case would be applicable here.    Moreover, the case had to do with a business which the state had the power to prohibit entirely within its borders, viz., that of a foreign insurance company.    The case of Hawker, 170 U. S. 189, 18 Sup. Ct. 573, 42 L. Ed. 1002, also dealt with an act of the Legislature, not with an ordinance, and much less with an official act based on neither statute nor ordinance, as is the case here.    Nor is any authority needed for the proposition that a valid local ordinance or by-law has the same authority within the territory to which it is limited as an act of Parliament or of the Legislature.    That is not the point here; we are bending our minds to the question whether this relator was dealt with by any act, ordinance or by-law, or by a mere assumption of power.

6. It does not seem necessary to point out that the case of Lieber-

man v. Vandecar, 199 U. S. 552, 26 Sup. Ct. 144, 50 L. Ed. 305, has no application to the present case. There the validity of this same ordinance was the only question up, the test being made by means of the writ of habeas corpus by one under arrest for selling milk without a permit, and who sought his discharge on the sole ground that the ordinance was void. It was for him to have compelled the giving of a permit to him, or the reinstatement of his old permit, by writ of mandamus; for the requirement of a permit is valid as within the power of regulation, and a permit is therefore necessary, the same as a requirement of a permit to build a house, or to extend a water pipe from the street main to your house, for instances out of many, is valid and a permit therefor necessary, even though it cannot be lawfully refused, being permitted not for prohibition but only for regulation. There is no question made here of the validity of this ordinance. The learned judge who wrote the opinion in the Lieberman Case several times speaks of the power "to grant or withhold" licenses or permits, using the phrase as though power to grant is only a corollary of power to refuse, which is quite true in the case of occupations which may be prohibited, but not at all true in the case of occupations which may not be prohibited, as has already been pointed out—a distinction which the learned judge himself would have been the first to make if there had been before him a case calling for it. But there was not; the sole question before him was whether the ordinance requiring a license was valid. We have been too recently admonished that the actual point decided in a case is all that we should follow, to be misled by inadvertent or irrelevant expressions in judicial opinions. Colonial City Traction Co. v. Kingston City R. Co., 154 N. Y. 493, 48 N. E. 900; Crane v. Bennett, 177 N. Y. 106, 69 N. E. 274, 101 Am. St. Rep. 722.

7. Since the foregoing was written the decision in the case of Metropolitan Milk Co. v. City of New York, 186 N. Y. —— 78 N. E. 1107, 113 App. Div. 377, 98 N. Y. Supp. 894, has been published. That case was an action for damages against the city and its department of health. The complaint was that they damaged the plaintiff by preventing it from selling its milk in the city of New York. A defence was pleaded in substance that the creamery or dairy of the plaintiff from which it brought its milk to the city was in a filthy, unwholesome and unhealthy condition, and that its milk was in the same condition, and that for that reason the department of health, after giving a hearing to the plaintiff on the said facts on notice, revoked the plaintiff's permit and prevented it from bringing such milk into the city and selling it. Such defence was held on demurrer not to be insufficient on its face, and this was affirmed by the Court of Appeals without opinion. Now, without regard to the power of the board to refuse a permit at will, or to revoke one at will, it is obvious that the pleaded defense was good, for no one can be liable in damages for preventing another from doing anything that is a crime, which the sale of unwholesome milk is. We cannot therefore assume that the Court of Appeals put its decision on any other ground, in the absence of any stated ground by it. Nor are the observations in the opinion of the Appellate Division based on the revocation of the per-

mit relevant or binding here, for they had reference to revocation in that case on a hearing on notice by the board of health on the assumption that such a hearing could be had by it; whereas in the present case there was no such hearing, and none could be had because none was prescribed. It seems to have been taken for granted by the learned judge there writing that there is some statute or ordinance prescribing such a hearing and granting such power of revocation and disqualification, whereas we now know there is not.

The order should be affirmed.

HIRSCHBERG, P. J., and HOOKER, J., concur on the ground that the permit could not be revoked in any event without notice to the relator and a hearing.

JENKS, J. (concurring). I am for affirmance because there was no ordinance or regulation of the board which authorized the revocation for the cause returned. Administrative policy in this case is not equivalent to an ordinance. I might stop here, but for the fact that a general discussion has been made. Bacon, Lord Verulam, says:

"For many times the things deduced to judgment may be meum and tuum when the reason and consequence thereof may trench to point of estate."

As I differ from the opinion of my Brother GAYNOR in many things, and from others in this court from their conclusion, I shall give my reasons for dissent. An eminent English judge, Parke, J., in Mirehouse v. Rennell, 1 Cl. & F. 527, 546, said:

"Our common-law system consists in the applying to new combinations of circumstances those rules of law which we derive from legal principles and judicial precedents; and for the sake of attaining uniformity, consistency, and certainty, we must apply those rules, where they are not plainly unreasonable and inconvenient, to all cases which arise; and we are not at liberty to reject them, and to abandon all analogy to them, in those to which they have not yet been judicially applied, because we think that the rules are not as convenient and reasonable as we ourselves could have devised. It appears to me to be of great importance to keep this principle of decision steadily in view, not merely for the determination of the particular case, but for the interests of law as a science." Cited in Dicey, Law and Opinion in England, p. 364.

I think that this board of health has power to enact an ordinance, or resolution of general application, to the effect that its permit to sell milk shall be revoked by it, if the holder or his servants be convicted in the courts of selling adulterated milk, and that such ordinance need not provide that notice must be given to the holder after such conviction before such revocation can be made. I think this ordinance would not offend against Constitution or laws. The obligation of a contract would not be impaired. Property would not be taken without due process of law. Unauthorized punishment would not be inflicted. No act of arbitrary despotism would be done. And I shall attempt to show that this ordinance would be in a lawful exercise of the police power. What is the purpose and the effect of such ordinance? Milk is almost an universal food, and, for the very young, the principal, if not the exclusive, food. It is capable of adulteration beyond the de-

tection of the ordinary consumer. If adulterated, it may not only be impaired, but be positively dangerous to health and to life. The dweller in a great city cannot investigate the origin, the collection or the processes which result in the sale of his daily food to him as a unit of many millions. He who buys milk for daily consumption cannot seek out the herd, or view the dairy, or investigate the channels or become acquainted personally with the agents whereby the milk finally reaches his table. And hence, government steps in to regulate the sale of this commodity by the requirement of a standard. The law now protects the consumer by punishing the seller of bad milk. It is decided that the regulation of such business by requirement that it must be carried on pursuant to a permit of the board of health of the city of New York is a lawful and reasonable exercise of the police power in the protection of the public health. People ex rel. Lieberman v. Vandecar, 175 N. Y. 440, 67 N. E. 913, 108 Am. St. Rep. 781; 199 U. S. 552, 26 Sup. Ct. 144, 50 L. Ed. 305. To deny the privilege of sale to those who have shown themselves improper persons to traffic in such food is a practical method of preserving the public health. In the last analysis the life and health of the consumer are preserved, rather than the livelihood of the seller. By such an ordinance, an individual would be deprived of his permit to sell milk perforce of a provision (of course applicable alike to all other holders of permits) because he is an unfit person in that he has been convicted of selling adulterated milk. Government is for all the people, not for an individual so as to assure to him continuance in a pursuit which may be dangerous and even death dealing.

1. In Polinsky v. People, 73 N. Y. 65, Andrews, J., for the court, says:

"That the Legislature, in the exercise of its constitutional authority, may lawfully confer on boards of health the power to enact sanitary ordinances, having the force of law within the districts over which their jurisdiction extends, is not an open question. This power has been repeatedly recognized and affirmed [citing authorities]. And ordinances designed to prevent the sale of adulterated milk are manifestly within the scope of sanitary regulations."

2. Such power has been conferred upon this board in the Greater New York charter by the Legislature of this state. People ex rel. Lieberman v. Vandecar, 175 N. Y. 440, 67 N. E. 913, 108 Am. St. Rep. 781.

3. (a) Generally, the power to license implies the power of revocation. In Doyle v. Continental Ins. Co., 94 U. S. 535, 540, 24 L. Ed. 148, the court say:

"The correlative power to revoke or recall a permission is a necessary consequence of the main power. A mere license by a state is always revocable. Rector v. Philadelphia, 24 How. (U. S.) 300, 16 L. Ed. 602; People v. Roper, 35 N. Y. 629; People v. Commissioners, 47 N. Y. 50. The power to revoke can only be restrained, if at all, by an explicit contract upon good consideration to that effect. Humphrey v. Pegues, 16 Wall. (U. S.) 244, 21 L. Ed. 326; Tomlinson v. Jessup, 15 Wall. (U. S.) 454, 21 L. Ed. 204."

There is not, to my mind, any force in the discrimination that would find such power of revocation in the state and not in a branch of the state government on whom the power to issue a permit has

been conferred by the state. In People ex rel Schwab v. Grant, 126 N. Y. 473, 27 N. E. 964, the court say (page 481 of 126 N. Y., p. 967 of 26 N. E.):

"A power to grant a privilege to one is inconsistent with the possession on the part of another of an absolute right to exercise such privilege. The requirement that a person must secure leave from some one to entitle him to exercise a right, carries with it, by natural implication, a discretion on the part of the other to refuse to grant it, if, in his judgment, it is improper or unwise to give the required consent."

In State ex rel. Chapman v. Board, 34 Minn. 387, as reported in 26 N. W. 124, the court, per Mitchell, J., say:

"It has never been held that the granting, or refusing to grant, such a license as this was the exercise of judicial power, and in fact this is not claimed in this case; and there is no possible distinction in this respect between refusing to grant a license and revoking one already granted. Both acts are an exercise of the police power. The power exercised and the object of its exercise is, in each case, identical, viz., to exclude an incompetent or unworthy person from this employment. Therefore, the same body which may be vested with the power to grant or refuse to grant a license may also be vested with the power to revoke. The statutes of all the states are full of enactments giving the power to revoke licenses of dealers, innkeepers, hackmen, draymen, pawnbrokers, auctioneers, pilots, engineers, and the like, to the same bodies, boards, or officers, who are authorized to issue them, such as city councils, county commissioners, selectmen, boards of health, board of excise, etc. The constitutionality of such laws, as a valid exercise of the police power, has often been sustained, and, indeed, rarely questioned. Cooley, Const. Lim. 343, 374, and cases cited."

See, too, People ex rel. Van Norder v. Sewer Com., 90 App. Div. 555-558, 559, 86 N. Y. Supp. 445, and authorities cited.

(b) The Metropolitan Milk & Cream Co. v. City of New York, 113 App. Div. 377, 98 N. Y. Supp. 894, decides that such permits are revocable by the department of health, and that the department was not restricted to a criminal prosecution of a licensee selling unwholesome milk. In that case, the city and the department answered separately. In paragraph 8 of each answer, the defendant pleaded that by virtue of the laws of the state of New York and the Sanitary Code of the city of New York, the department of health of the city had authority and power to prevent the plaintiff from keeping and selling therein impure milk, and also that after investigation it had found that the plaintiff was shipping and sending such milk to the city to be sold, whereupon the department, after notice to the plaintiff and a hearing, revoked the license or licenses, "as it had a right to do and as it was its public duty to do and not otherwise." The following questions were certified to the Court of Appeals:

"Is the separate defense contained in the answer of the defendant the city of New York [or mutatis mutandis the department of health of the city of New York] insufficient in law upon the face thereof?"

That court affirmed the order, and answered the questions certified in the negative. 186 N. Y. ——, 78 N. E. 1107. I regard it as settled, then, by the highest court of this state, that the department of health has the power to revoke permits issued for the sale of milk in that city. The principle is stated in Cooley's Constitutional Limitations (7th Ed.) p. 887:

"Dealers may also be compelled to take out a license, and the license may be refused to a person of bad reputation, or taken away from a party detected in dishonest practices."

· The liberty to pursue any particular vocation or calling is subject to regulation by the police power for the benefit of the public morals, welfare or health. Dent v. West Virginia, 129 U. S. 114, 9 Sup. Ct. 231, 32 L. Ed. 623; Soon Hing v. Crowley, 113 U. S. 703, 5 Sup. Ct. 730, 28 L. Ed. 1145; Gundling v. Chicago, 177 U. S. 183, 20 Sup. Ct. 633, 44 L. Ed. 725; Crowley v. Christensen, 137 U. S. 86, 11 Sup. Ct. 13, 34 L. Ed. 620. In the last case cited, the court say:

"The possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order and morals of the community."

In Dent v. West Virginia, supra the court, per Field, J., says:

"It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex, and condition. This right may in many respects be considered as a distinguishing feature of our republican institutions. Here all vocations are open to every one on like conditions. All may be pursued as sources of livelihood, some requiring years of study and great learning for their successful prosecution. The interest, or, as it is sometimes termed, the estate acquired in them; that is, the right to continue their prosecution, is often of great value to the possessors, and cannot arbitrarily be taken from them, any more than their real or personal property can be thus taken. But there is no arbitrary deprivation of such right where its exercise is not permitted because of a failure to comply with conditions imposed by the state for the protection of society. The power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as, in its judgment, will secure or tend to secure them against the consequences of ignorance and incapacity as well as of deception and fraud."

4. If this board has the power of revocation for sale of bad milk, it can express that power by ordinance. The permits in the Metropolitan Case, supra, were revoked on the ground that the plaintiff had furnished and had sold impure milk. Unless there could be revocation by the board only after actual investigation by the board itself and its determination thereupon that the relator had twice sold impure milk, I can see no objection to an ordinance based upon such offending. · Indeed, section 1172· of the charter provides that the board may provide for the enforcement of the Sanitary Code "by such fines, penalties, forfeitures or imprisonment as may by ordinance be prescribed." See, too, the full section, also section 1169, and Polinsky v. People, supra; Metropolitan Milk and Cream Co. v. City of New York, supra; 4 Am. and Eng, Ency. of Law (2d Ed.) p. 599. The term "forfeiture" may refer to the absolute or indefinite revocation of a license. Words and Phrases Judicially Defined, p. 2897.

5. The ordinance is based upon the proposition that he who has sold impure milk is an unfit person to hold a permit to sell milk. In resting the ordinance upon a conviction for the very· act which the board seeks to prevent, the board but applies the doctrine of res judicata. For the conviction was, as between the state and the individual, an adjudication of the fact that the relator had done the thing

prohibited. Hawker v. New York, 170 U. S. 189, 18 Sup. Ct. 573, 42 L. Ed. 1002. The board would have a right to ordain that such convictions should be sufficient evidence of the unfitness of the relator to hold such a license. Hawker v. New York, supra; Sprayberry v. City of Atlanta, 87 Ga. 120, 13 S. E. 197. The ordinance is founded upon an adjudication that the relator had sold impure milk, as much as if the board or department had investigated the alleged offense and had found it. Surely a conviction of the offense in the criminal court may be as cogent proof that the relator had violated the law as a determination by the board upon its own investigation. In Hawker v. New York, supra, the statute in effect made the conviction evidence of the absence of the requisite good character. The court held that if the state might require good character as a condition, "it may rightfully determine what shall be the evidences of that character." It said, per Brewer, J.:

"We do not mean to say that it has an arbitrary power in the matter, or that it can make a conclusive test of that which has no relation to character, but it may take whatever, according to the experience of mankind, reasonably tends to prove the fact and make it a test. County Seat of Linn County, 15 Kan. 500, 528. Whatever is ordinarily connected with bad character, or indicative of it, may be prescribed by the Legislature as conclusive evidence thereof. It is not the province of the courts to say that other tests would be more satisfactory, or that the naming of other qualifications would be more conducive to the desired result. These are questions for the Legislature to determine. 'The nature and extent of the qualifications required must depend primarily upon the judgment of the state as to their necessity.' Dent v. West Virginia, p. 122 of 129 U. S., p. 233 of 9 Sup. Ct. (32 L. Ed. 623)."

The fact that there would be an ordinance, not a statute, does not affect the application of the principle. An ordinance pursuant to the authority of the Legislature has like force within the limits of its operation as a statute. Polinsky v. People, supra; Village of Carthage v. Frederick, 122 N. Y. 268, 25 N. E. 480, 10 L. R. A. 178, 19 Am. St. Rep. 490; Dillon on Municipal Corporations (4th Ed.) § 308, and note; Heland v. City of Lowell, 3 Allen (Mass.) 407, 81 Am. Dec. 670. In Sprayberry v. City of Atlanta, supra, the court held that the common council, in its power to regulate the retail of ardent spirits, and its then discretion to issue license to retail or to withhold the same, might pass an ordinance to the effect that the mayor and common council could forfeit a license, and that a conviction of a violation of a state statute in relation to the sale of ardent spirits shall work an immediate revocation of the license.

6. Notice is not essential. The doctrine of Stuart v. Palmer, 74 N. Y. 183, 30 Am. Rep. 289, does not apply. The permit is not property in the sense that such a revocation thereof is the taking of property without due process in that there is no notice thereof. "The popular understanding of the word license undoubtedly is a permission to do something which without a license would not be allowed. This is also the legal meaning." Cooley, J., in Youngblood v. Sexton, 32 Mich. 406, 20 Am. Rep. 654. "A license is not property. It is a mere temporary permit to what otherwise would be illegal, issued in the exercise of the police power." Words and Phrases Judicially Defined citing Lantz v. Hightstown, 46 N. J. Law, 107; Voight v.

Board of Excise, 59 N. J. Law, 358, 36 Atl. 686, 37 L. R. A. 292. The license or permit is not a contract. Commonwealth v. Kinsley, 133 Mass. 578. In Metropolitan Board of Excise v. Barrie, 34 N. Y. 657, the court, speaking of an excise license, say:

"These licenses to sell liquors are not contracts between the state and the person licensed, giving the latter vested rights, protected on general principles and by the Constitution of the United States against subsequent legislation; nor are they property in any legal or constitutional sense. They have neither the qualities of a contract or of property, but are merely temporary permits to do what otherwise would be an offense against a general law. They form a portion of the internal police system of the state; are issued in the exercise of its police powers, and are subject to the direction of the state government, which may modify, revoke or continue them, as it may deem fit."

Neither the ordinary permit or license, nor the former excise license, is so similar to the present liquor tax certificates as to make the decisions that hold that the latter are "a species of property" apply. The quality of property is attributed to the liquor tax certificates perforce of provisions singular to the present excise tax. Matter of Lyman, 160 N. Y. 96, 54 N. E. 577; Niles v. Mathusa, 162 N. Y. 546, 549, 57 N. E. 184; People v. Durante, 19 App. Div. 292, 45 N. Y. Supp. 1073. The purpose of notice is to afford a hearing, but the ordinance of revocation would be based upon conviction in a criminal court for sales of unwholesome milk, whereat, of course, the relator was entitled to a hearing. The fact of the improper sales was, therefore, adjudicated after a hearing. What purpose is served by a hearing before the board or department when the ordinance is based upon such adjudications? The board or department cannot review the conviction. The learned Special Term suggests that inasmuch as the agricultural law made possible a conviction although the seller has no knowledge of the impurity of the milk, that if the board afforded a hearing, there might be a plea in extenuation of the conviction. But this view is from the point that the revocation is a punishment; whereas, it is but for the protection of the public health. It is the fact of the sales of impure milk that moves the board to revoke the permit, and not whether the sale was intentional, wanton, or negligent. It certainly would impair the vigor of the ordinance if the board were to make it depend upon the question whether the scienter of the seller were proved in the criminal trial; for, in that event, the careless or negligent seller would be licensed to continue in his traffic. If a conviction per se furnished the reason for the ordinance, and the conviction could not be disturbed by the board, and if the ordinance is based upon the conviction, and not upon the intent of him who was convicted, it seems to me that notice and a hearing before the ordinance was invoked would be a vain thing. Suppose that notice were given, what could be urged by the relator as his legal right? To say the least, it was entirely proper in the Metropolitan Case, supra, that the licensee should receive notice and should be heard, for the department itself made the investigation and the determination that the licensee had sold impure milk. But in the case of the ordinance, the licensee would have been afforded a hearing on that question in the procedure of the courts which resulted in convictions of the offense. To afford him another hearing is but

to seek to review the judgment of the court. In Martin v. State, 36 N. W. 554, 23 Neb. 371, the statute provided that the mayor and common council might by ordinance license, restrain, regulate, or prohibit the selling of liquor, and that the licenses might be revoked upon the conviction of the licensee of a violation of the law pertaining to the sale of intoxicating liquor; and the contention was that notice must be given to the licensee before revocation. But the Supreme Court of Nebraska, per Reese, C. J., after an examination of many authorities, said:

"In this case, the statute makes no reference to the hearing of a complaint by the mayor and council, but simply provides that 'the license shall be revoked by the mayor and council, upon conviction of the licensee of any violation of any law, ordinance, or regulation pertaining to the sale of such liquors,' etc. No trial or investigation could be had. The certificate of the police judge showing a conviction of plaintiff in error was before the council. They had but a simple ministerial duty to perform, in obedience to the plain mandate of the law, and that was to revoke the license. It is stipulated that he was convicted of the offense stated in the certificate of the police judge. It is admitted that the certificate was true. That being the case, no defense could have been made, and no notice was necessary to give the council jurisdiction."

In Health Department v. Rector, 145 N. Y. at pp. 40, 41, 39 N. E. at p. 835 (45 Am. St. Rep. 579) the court, per Peckham, J., say:

"The Legislature has power, and has exercised it in countless instances, to enact general laws upon the subject of the public health or safety without providing that the parties who are to be affected by those laws shall first be heard before they shall take effect in any particular case. So far as this objection of want of notice is concerned, the case is not materially altered in principle from what it would have been if the Legislature had enacted a general law that all owners of tenement houses should, within a certain period named in the act, furnish the water as directed. Indeed, this act does contain such a provision, but the plaintiff has not proceeded under it. If, in such case, the enforcement of the direct command of the Legislature were not to be preceded by any hearing on the part of any owner of a tenement house, no provision of the state or federal Constitution would be violated. The fact that the Legislature has chosen to delegate a certain portion of its power to the board of health, and to enact that the owners of certain tenement houses should be compelled to furnish this water after the board of health had so directed, would not alter the principle, nor would it be necessary to provide that the board should give notice and afford a hearing to the owner before it made such order. I have never understood that it was necessary that any notice should be given under such circumstances before a provision of this nature could be carried out."

See, too, Chicago, etc., Railroad v. Nebraska, 170 U. S. 57, 76, 18 Sup. Ct. 513, 42 L. Ed. 948; McGehee's Due Process of Law, 374, note.

Moreover, if the ordinance provided that revocation would follow upon such conviction, the holder of the permit would be bound to take notice that such was the law. Heland v. City of Lowell, 3 Allen (Mass.) 407, 81 Am. Dec. 670; Dillon, supra, § 331, note; McQuillan's Municipal Ordinances, § 22, and authorities cited; Baldwin v. Smith, 82 Ill. 162. In the last case, the court say:

"There is no condition in the license, and no reference to any ordinance of the town authorizing its revocation for cause, yet it must be held to have been granted subject to such ordinances of the town as had a legal existence at the time the same was granted, and such as were within the competency of the town authorities to enact."

7. The revocation by ordinance would not be an exercise of judicial power, but would be incidental to the administrative power. Matter of Armstrong v. Murphy, 65 App. Div. 126, 72 N. Y. Supp. 475; State v. Doyle, 40 Wis. 175, 22 Am. Rep. 692; State ex rel Chapman v. Board, 34 Minn. 387, 26 N. W. 123; State v. Gregory, 83 Mo. 123, 53 Am. Rep. 565; McGehee, supra. In the case of Public Clearing House v. Coyne, 194 U. S. 497, 24 Sup. Ct. 789, 48 L. Ed. 1092, the court say (pages 508, 509 of 194 U. S., p. 793 of 24 Sup. Ct. [48 L. Ed. 1092]):

"That due process of law does not necessarily require the interference of the judicial power is laid down in many cases and by many eminent writers upon the subject of constitutional limitations. Murray's Lessee v. Hoboken Co., 18 How. (U. S.) 272, 280, 15 L. Ed. 372; Bushnell v. Leland, 164 U. S. 684, 17 Sup. Ct. 209, 41 L. Ed. 598."

And, see, too, Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525.

It is true that the effect of the rule is to bar the seller from continuance in that traffic. But that is but a consequence of the working of the rule, not the object of it. The ordinance would not be for the punishment of the seller for his past offense, but for the protection of the buyers. In Hawker v. New York, supra, the statute deprived the plaintiff of the right to practice medicine perforce of conviction of a crime, and the point was made that it was a further punishment. It was met by the court, per Brewer, J., who said:

"That the form in which this legislation is cast suggests the idea of the imposition of an additional punishment for past offenses is not conclusive. We must look at the substance, and not at the form, and the statute should be regarded as though it in terms declared that one who had violated the criminal laws of the state should be deemed of such bad character as to be unfit to practice medicine, and that the record of a trial and conviction should be conclusive evidence of such violation. All that is embraced in these propositions is condensed into the single clause of the statute, and it means that and nothing more. The state is not seeking to further punish a criminal, but only to protect its citizens from physicians of bad character. The vital matter is not the conviction, but the violation of law. The former is merely the prescribed evidence of the latter."

See, too, Queen v. Vine, 10 Q. B. L. R. 195. That convictions are not a full deterrent is shown in this case, inasmuch as there were four convictions at different times, extending over a period of two years.

To my mind there would be nothing sinister in this ordinance, or nothing contrary to the spirit or the letter of law. In these days of adulteration of food, when, as the poet sings:

"Chalk and alum and plaster are sold to the poor for bread,
    And the spirit of murder works in the very means of life,"

—it would be a wholesome measure in furtherance of the principle of the greatest good of the greatest number.

WOODWARD, J., concurs.