THE PEOPLE ex rel. AUGUST SCHWAB, Appellant, *v.* HUGH J. GRANT, Mayor, etc., Respondent.

The requirement that a person must secure leave from some other one to entitle him to exercise a right carries with it, by necessary implication, a discretion upon the part of the other to refuse it, if in his judgment it is improper or unwise to give the required consent.

The provision of the act of 1853, " to punish frauds and to suppress mock auctions " (§ 3, chap. 138, Laws of 1853), which requires all auctioneers doing business in the city and county of New York to obtain from the mayor a license on filing a bond as prescribed, did not nor does the similar provision of the New York Consolidation Act of 1882 (§ 113, chap. 5 of chap. 410, Laws of 1882), which has superceded that of 1853, make it obligatory upon the mayor to grant a license to any person applying therefor and filing the bond required; but by necessary implication authorizes him to refuse a license to any person whose character and qualifications are not satisfactory to him or where in his judgment public interest requires it.

The exercise of this discretion on the part of the mayor, is not subject to supervision or control.

Accordingly, *held*, that an application for a mandamus to compel the mayor to issue a license to one who had filed the bond required was properly denied.

The history of the legislation on the subject of licensing auctioneers given.

(Argued April 13, 1891; decided June 2, 1891.)

APPEAL from order of the General Term of the Supreme Court in the first judicial department, made November 10, 1890, which affirmed an order of Special Term denying an application for a mandamus, as set forth in the opinion.

*F. J. Bischoff* for appellant. The answer of the mayor does not deny any of the allegations of the petition as to the application, the tender of a proper bond and the good character of the petitioner. Therefore, no issue was raised on these points. (*People ex rel. McGuire*, 29 N. Y. S. R. 674; *People ex rel. v. Paton*, 20 Abb. [N. C.] 195.) The mayor's conclusion that Schwab was guilty of a misdemeanor was unwarranted. (R. S. chap. 17, §§ 6, 7.) Section 113 of the Consolidation Act gives the mayor the right to revoke a license issued by him on

complaint of a person defrauded by an auctioneer after he has taken testimony in the case. Even if this section applies to a person applying for a license, it does not affect this case, for no testimony has been taken. This section applies only to purchasers from an auctioneer, not to persons employing him to sell. (*Vinders* v. *Stacom*, 12 N. Y. S. R. 113.) The statute requiring a bond and a license is an innovation on the common law, and it will not be presumed that the legislature intended that the innovation should extend any further than the language of the act plainly declares. (*People* v. *Perry*, 13 Barb. 208; *Ex parte Parsons*, 1 Hill, 655.) The respondent alleges as a reason for not granting the license, that the relator had been guilty of a misdemeanor in selling without one. If there ever was such a law in the statute books, it has, so far as the city of New York is concerned, been repealed by the Consolidation Act. (*In re N. Y. Inst.*, 25 Abb. [N. C.] 37.) The discretion in issuing a writ of mandamus is not an absolute or arbitrary discretion, but is to be regulated and controlled by legal rules. (*People* v. *Common Council*, 78 N. Y. 56.) Having shown affirmatively that the relator has done all that is required of him by law, as a condition precedent to the right demanded, he is entitled to the writ. (*People ex rel.* v. *Canal Comrs.*, 73. N. Y. 447; *People* v. *Hoyt*, 66 id. 406.)

*D. J. Dean* for respondent. The application of the relator was addressed to the discretion of the court below; the order, therefore, is not reviewable by appeal to this court. (*People* v. *Campbell*, 72 N. Y. 499; *People* v. *Wendell*, 71 id. 171; *People* v. *Ferris*, 76 id. 326; *People* v. *Bd. Suprs.*, 64 id. 600; *People* v. *Common Council*, 78 id. 56; *Sage* v. *R. R. Co.*, 70 id. 220.) The issuing of a license to an auctioneer in New York city is discretionary with the mayor, and the writ of mandamus was, therefore, properly denied. (5 R. S. [8th ed.] 371; Laws of 1838, chap. 52.; Laws of 1853, chap. 138; Laws 1882, chap. 410, § 1985; *People ex rel.* v. *Newton*, 112 N. Y. 399; *People ex rel.* v. *Bd. Suprs.*, 18 Abb. Pr. 12; *People ex rel. Slavin* v. *Wendell*, 71 N. Y. 171; *People* v. *Babcock*, 16 Hun, 313.)

Opinion of the Court, per RUGER, Ch. J.

A writ of mandamus in the present case is not the proper remedy. Mandamus will never lie to compel a public officer to perform his duties in a particular way. (*People er rel.* v. *City of Troy*, 78 N. Y. 33; *People ex rel.* v. *Chapin*, 39 Hun, 230; *People ex rel.* v. *Auditors*, 20 id. 150; *People ex rel.* v. *Supervisors*, 19 id. 11; *People ex rel.* v. *Furman*, 12 Abb. [N. C.] 272.) The facts of this case show that the mayor did not act arbitrarily, but that there were sufficient reasons for the refusal to grant the license. (1 R. S. chap. 17, §§ 6, 7; *People ex rel.* v. *French*, 7 N. Y. S. R. 253; *People ex rel.* v. *French*, 110 N. Y. 494; *People ex rel.* v. *French*, 102 id. 724.)

RUGER, Ch. J. This appeal is brought by the relator, to procure a reversal of an order of the General Term affirming an order of the Special Term, which refused to grant an alternative mandamus against the mayor, requiring him to approve the relator's bond and issue to the relator a license as auctioneer in the city of New York, or show cause to the contrary. No question is made, but that the bond offered by the relator was sufficient in form and substance to comply with the requirements of the law; but it is claimed that the mayor, in the exercise of his discretion, had the right to refuse to issue the license and was justified in so doing. On the other hand, it is argued that the relator was entitled, as matter of right, to a license upon filing the bond required by the charter. The appointments of autioneers and the regulation of their rights, duties and compensation, have always been the subject of legislation in this state. It has, from the first, been assumed, in dealing with the subject by the public authorities, that no person had a natural right to prosecute such a business at his pleasure, and privileges to do so have always been granted by some authority, subject to conditions and regulations, which excluded the great body of the people from the prosecution of such business. The right to regulate, control and limit the number of persons employed in such business has been exercised by the legislature as one of its acknowledged police

powers, from colonial times to the present and, I believe, has never been questioned. The persons who have been permitted to pursue the avocation of auctioneers in the state have always enjoyed special privileges, and have been subject to special conditions and restrictions which, for the purpose of this inquiry, it is unnecessary to enumerate in detail. The question here relates to the authority which the mayor of New York now has, under the charter of that city, over the subject of licensing auctioneers, and upon the construction of that instrument the determination of the appeal depends. That authority is contained in section 113 of chapter 5 of the Consolidation Act of 1882, and reads as follows: " The mayor shall have authority to grant licenses to any person engaged in and carrying on the business and occupation of an auctioneer, or desiring to be so engaged, on such person filing a bond with two good sureties in the penal sum of two thousand dollars. The mayor on the complaint of any person having been defrauded by any auctioneer, or the clerk, agent, or assignee of such auctioneer doing business in said city, is authorized and directed to take testimony under oath in relation thereto; and if the charge shall, in his opinion be sustained, he shall revoke the license granted to him and direct the bonds to be forfeited." In the same connection the mayor is also authorized to grant licenses for various other purposes, among which are those of using hay scales and limiting the number thereof; scavengers of night soil; public exhibitions; keeping boarding-houses for emigrant passengers; booking emigrant passengers, etc., and to persons soliciting patronage for hotels, inns, steamboats and other transportation lines. The rights, duties, fees and privileges of auctioners are also defined and regulated by special provisions, and particularly so in relation to their rights and duties in making sales of property under judicial orders or statutory provisions. (§§ 1983 to 1998.) All sales at auction in the city of New York, not under the authority of the United States, are required to be made by licensed auctioneers. (§ 1983 of the Consolidation Act.)

There has been no time in the history of the state when it

was lawful for citizens generally to pursue the occupation of auctioneers or to engage in the business of selling property at public vendue. A brief reference to some of the laws on the subject will show the course of legislation and the aspect in which auctioneers have been uniformly regarded by the law-making power of the state. By chapter 4, colonial laws of 1774, all persons were prohibited from exposing goods for sale at public vendue auction in New York, except citizens of the United States who have obtained a license so to do from the mayor or recorder of such city. This provision was substan-- tially re-enacted by chapter 4 of the Laws of 1794. By chapter 27, Laws of 1791, all persons, except those duly licensed, were prohibited from selling goods at auction, and the governor of the state, by the advice and consent of the council of appointment, was authorized to appoint all vendue masters or autioneers, but not to exceed twelve in the city of New York. By chapter 62, Laws of 1792, the number authorized to be appointed in New York city was increased to twenty-four. Chapter 116, Laws of 1801, substantially re-enacts the provisions of the Laws of 1791 and 1792. By the Revised Statutes auctioneers were declared to be administrative officers of the state and were required to be appointed by the governor ; their number being limited to fifty-four for the city of New York, four for the city and county of Albany, and one or more for every other village or county where they were deemed necessary by the appointing power. They were also forbidden from exercising their vocation outside of the locality for which they were appointed. (Chap. 5, title 1, part 1, R. S.)

By chapter 52 of the Laws of 1838, it was provided that any citizen of the state might become an auctioneer and transact his business in the county in which he resided, upon filing with the comptroller a satisfactory bond requiring, among other things, a quarterly return to the comptroller of all goods sold or struck off by him. It was also provided that whenever they were found guilty, by a police court, mayor's court, or court of criminal jurisdiction, of any fraudulent practices, they should be thereafter forever disqualified from exercising the

rights or pursuing the business of auctioneers.    (3 vol. Statutes at Large, p. 656.)

By reason of the numerous frauds and the disastrous con-sequences which followed this general license to persons who had filed the requisite bonds to carry on the business of auctioneers, and especially in the city of New York, it was, by chapter 138 of the Laws of 1853, enacted that "all auc-tioneers doing business in the city and county of New York shall hereafter be required, between the first and fifteenth of June in each and every year, to obtain from the mayor of said city a license to engage in and carry on such business and occu-pation, upon filing a bond with two good sureties in the penal sum of two thousand dollars." The mayor was also thereby authorized, on the complaint of any person defrauded, to take evidence on oath in relation thereto, and if, in his opinion, the charge was sustained, to revoke such license.    (3 vol. Statutes at Large, 665.)

These provisions were substantially embodied in section 113 of the Consolidation Act, which constitutes the law now before us for construction.    A review of the provisions of the various acts referred to with a view of arriving at their meaning and purpose, will, I think, when discovered, afford a solution of the question involved in this appeal.

It cannot, of course, be claimed that there was any time, previous to the act of 1838, when any person could exercise the duties or prosecute the business of an auctioneer but those who had been selected for that purpose by the appointing power.    It is, therefore, sufficient for our purpose to commence with the laws of that year and inquire what change was made by them in the office and character of auctioneers.    It will be observed that that act did not assume to repeal any special existing law, but effected that result only so far as its provis-ions were inconsistent with previous statutes on the subject. The provision by which any citizen of the state might, on filing a proper bond, follow the calling of an auctioneer, neces-sarily superceded the authority of the governor to make appointments and abolished all limitations upon the number of

persons who might engage in that business. And this was the extent of the change effected. In other respects the laws in relation to auctioneers were left unaffected, and they remained still possessed of the privileges and immunities theretofore granted to such officers, and subject to the duties, obligations and restrictions imposed by the statutes of the state, and I see no reason why they did not still continue, to a certain extent after it, administrative officers of the state. They still had the exclusive right to conduct all auction sales in the state, and were bound to make returns to the comptroller and pay to him the duties imposed on public sales, and perform such other duties as were enjoined upon them by statute. The practical effect of this act was, therefore, simply to change the mode by which auctioneers were designated and permit an indefinite extension of the number of such officers. This state of things continued until 1853, when the act of that session was passed. I conceive it to be of controlling importance, in the determination of this appeal, to discover the real meaning and effect of that act, for when that is done, I think we have a sure guide by which to determine the scope and effect of the provisions of the Consolidation Act. In the prosecution of this object, it is proper to look at the preamble of the act, the evils which it attempted to reach and cure, and the circumstances under which it was passed. The preamble recites, among other things, that "Whereas, certain evil disposed persons, especially in the city of New York, have for several years past, by means of certain fraudulent and deceitful practices known as mock auctions, most fraudulently obtained great sums of money from unwary persons, to their great impoverishment," it was, therefore, enacted that all auctioneers doing business in the city and county of New York shall hereafter be required *in every year* to obtain a license from the mayor of New York, and file a bond of two thousand dollars; and all prior acts conflicting with these provisions were repealed. The material distinction between this act and that of 1838 was that under it a license was to be issued, as well as a bond to be filed, and upon the wise exercise of that power the whole beneficial operation of

the act necessarily depended. The number of persons to be licensed was not indicated in the act, but that subject was manifestly left to the discretion of the mayor. The plain and obvious purpose of this act was to cure the evil produced by the indiscriminate admission of citizens, of whatever character, to pursue the business of auctioneers, effected by the act of 1838, by providing a limitation upon the number of such persons and subjecting them to a preliminary scrutiny as to their character and qualifications. The limitation upon the duration of the license, and the requirement for an annual renewal of the bond, indicate an intention to bring the qualifications of the applicant under the frequent scrutiny of the mayor in order to prevent any abuses of the privileges of such license. It is notorious that under the practical construction given to the act for nearly forty years by the authorities of the city, the evils of the former system have been wholly eradicated, and the administration of the law on the subject has been rendered entirely satisfactory. According to that construction it was held that the act imposed duties upon the mayor to be performed, as well as powers to be exercised, and, by necessary implication, authorized him to protect the community by a refusal to license persons whose character and qualifications were not satisfactory to him. If this had not been effected, the act would have been inoperative and powerless for any remedial purpose. If the mayor was bound to license any citizen filing a proper bond, who applied to him for appointment, without regard to his character or reputation, the reform contemplated by the statute would not have been accomplished and the plain purpose of the act would have been defeated. Such a construction would also involve the manifest absurdity of compelling him to reissue licenses to persons who had been convicted by him of fraudulent practices and whose licenses had been revoked, thus practically nulifying one of the express provisions of the statute.

It seems to us that such a construction is wholly inadmissible. We think the law was intended to effect a reform of the abuse previously existing by restoring the former method of appointment through the selection of auctioneers, and subjecting the

persons applying for such appointment to the scrutiny of the highest officer of the municipality, with a view of guarding against the intrusion of incompetent and unfit men into such offices. The practice of allowing all persons who chose to do so, to perform the duties of an auctioneer, had been tried and proved a failure, and the act of 1853 was an effort to reform the evils of that mode and to return to more satisfactory methods, and in this way, and this only, were the evils of the former system to be eradicated.

We think that section 113 of the Codification Act, which superceded the act of 1853, is subject to the same construction which we have applied to the act of 1853. Although some changes of phraseology were made in the effort to codify, it was not, we think, intended to effect any change in the meaning or purpose of the law, so far as the question here involved is concerned. In the one case all persons were prohibited from prosecuting the business of auctioneer in the city of New York who had not given a satisfactory bond and secured a license from the mayor; and by the other the mayor was given authority to grant such licenses in case the persons applying for them had filed a satisfactory bond. There is no inconsistency in the language of the two acts, and we do not think the change in verbiage was intended to effect any change in the meaning or effect of the pre-existing statute. The latter act does not, in terms or by fair implication, require the mayor to grant such licenses, but, by necessary implication, confers the power to refuse them when, in his judgment, he thinks the public interest requires it. A power to grant a privilege to one is inconsistent with the possession on the part of another of an absolute right to exercise such privilege. The requirement that a person must secure leave from some one to entitle him to exercise a right, carries with it, by natural implication, a discretion on the part of the other to refuse to grant it, if, in his judgment, it is improper or unwise to give the required consent.

A reference to the powers conferred upon the mayor by the same act in respect to licensing public entertainments, hotel,

steamboat and railroad solicitors, public scavengers, etc., seems to place this view beyond dispute. No one, we think, could reasonably claim that the exercise of the discretion of the mayor with respect to the subject of granting such licenses, could be subjected to supervision or control. The powers exercised by public officers over the subjects indicated have been general throughout the state in municipal corporations, and most salutary in their operation, and constitute the only protection afforded large communities from the evils of immoral and vicious exhibitions and the prosecution of employments tending to disturb the public health, peace and comfort. The power conferred upon the mayor by the charter, to grant licenses, is expressed in substantially the same language in the same connection as to all of the subjects referred to, and must, we think, be governed by the same rules of construction.

A determination of this appeal, which should have the effect of denying the mayor's discretion in the exercise of the power conferred by these provisions, would, we think, be most unwise and impolitic and subversive of the policy of the charter, as well as the best interests of the municipality where it is exercised. The practice of nearly a century in this state has taught us that there is little to fear from an abuse of this power, for during that time we have yet to learn of an instance where it has been perverted for improper purposes, or excited public condemnation or disapproval.

In the government of the affairs of a great municipality many powers must necessarily be confided to the discretion of its administrative officers, and it can be productive only of mischief in the treatment of such questions to substitute the discretion of strangers to the power in place of that of the officers best acquainted with the necessities of the case and to whom the legislature has specially confided their exercise.

Whether any remedy is afforded by the law for an abuse of such discretion it is not now necessary to inquire, as that question cannot be presented on an application for a mandamus. To obtain relief by mandamus it is necessary that the relator should show an invasion of a clear legal right. This he has not

done in this case, and we are, therefore, of the opinion that the order of the courts below should be affirmed with costs.

All concur, except EARL, J., not voting.

Order affirmed.