Froessel, J.
Petitioner is a domestic trucking corporation with offices in midtown Manhattan, and its trucking services are carried on in New York City’s garment industry. It was incorporated in 1955, and consists of four persons who are its officers and directors, each of whom owns 25% of the corporate stock. Petitioner employs nine persons, other than its principals, and does a gross annual business of $90,000.
In July, 1957 petitioner filed an application for public cart licenses for its five trucks, pursuant to section B32-93.0 of article 15 (ch. 32) of the Administrative Code of the City of New York, which makes it “ unlawful for any person to operate or cause the operation of any public cart without a license therefor ”, A “public cart” is defined as “every vehicle, either horse-drawn or motor driven, which is kept for hire or used to carry merchandise, household or office furniture or other bulky articles within the city, for pay ” (§ B32-92.0). The annual license fee for a motor-driven public cart is $5 (§ B32-94.0). Section B32-96.0 regulates the rates to be charged by public cartmen and the number of persons to be employed on a particular hauling job. It provides that the rates may be agreed upon in advance, provided the public cartman furnishes his customer with a written memorandum — upon blanks to be furnished by the Department of Licenses — which clearly sets forth the terms of the contract. In the absence of a special agreement, a schedule of controlling rates is provided. The code further limits the number of men to be employed on any one job to four, including the driver, “except when specially agreed upon by the person hiring the public cart ’ ’. A violation of any of the provisions of article 15 is made punishable by a $25 fine, a 30-day jail term, or both (§ B32-96.1).
The licensing of public cartmen and the regulation of their rates is deeply rooted in the Charter of New York City (L. 1897, ch. 378, § 49, subd. 20, re-enacted as L. 1901, ch. 466, § 51, p. 30) and in the ordinances passed in pursuance thereof (see Code of Ordinances, 1914, ch. 7, tit. II, §§ 305-314, pp. 69-71), and antedates the unification in 1897 of the present five boroughs of New York City into one municipality (L. 1854, ch. 384, tit. II, § 13, subd. 4, p. 840; Ferdon v. Cunningham, 20 How. Prac. 154 [1860]; City of Brooklyn v. Breslin, 57 N. Y. 591 [1874]). The present provisions of article 15 of title B of *305 chapter 32 of the code are drawn almost verbatim from a city ordinance passed in 1914 (see Cosby’s Code of Ordinances, 1915, eh. 14, art. 11, pp. 246-248).
The application for the licenses was denied by the Commissioner of Licenses of the City of New York (hereinafter called the Commissioner) on the ground that petitioner was not a fit and proper party to be licensed to operate public carts. The finding of unfitness was based on the fact that petitioner’s treasurer, James Plumeri, had been convicted of extortion in 1937 in connection with garment trucking racketeering and sentenced to 5 to 10 years’ imprisonment, together with the fact “ that the carting intended to be carried on is in the garment center district which has been under investigation with reference to the racketeering that has been alleged to be rampant in that district ’ ’. The act of extortion for which Plumeri was convicted was connected with his activities as business agent of a garment center trucking association. The Commissioner took the position that it was his duty to require that “ licensees be of good and reputable character to insure the public safety and morals of the public with whom such individuals do business and come in contact by reason thereof ”, and that in refusing to issue the licenses he “ acted in good faith for the safety and welfare of the general public”.
In sustaining the Commissioner’s determination, Special Term held: “ Implicit in the requirement of a license, there is not only an authorization but a command to take reasonable steps to see that the applicant is a fit and proper person to engage in the licensed business ”. The court dwelt at length on the infiltration of criminal elements into New York City’s garment industry, and concluded that the Commissioner’s “ refusal of a license to this applicant, far from being capricious and unreasonable, is sound and salutary. * * * It is manifest that the license commissioner has acted with propriety and within his competence; his action must be sustained ’ ’.
In reversing Special Term, the Appellate Division reasoned that any discretionary powers exercised by a licensing official must be delegated by statute, expressly or by clear implication, and must be accompanied by express or implied standards to guide the administrator’s exercise of discretion. The court recognized “ certain special circumstances in which an admin *306 istrative official charged with the duty of granting licenses may nevertheless deny the license even though delegations and standards of the kind just referred to have not been expressly provided ’ ’, namely, where the license would be used in violation of law, or 11 where the use would patently deny a public policy for which the licensing statute is evidently, from its history or from its face, the implement of execution (Matter of Rosenberg v. Moss, 296 N. Y. 595; People ex rel. Schwab v. Grant, 126 N. Y. 473 * * * However, it felt that “ the statutes applicable to public cartmen suggest licensing only for * * * identification, collection of revenue, and control of the stipulated fees chargeable to the public ” (emphasis supplied), and that the Commissioner had no power to withhold public cart licenses “ on the basis of general character and fitness of the applicant or for other arrogated qualifications ” in the absence of express statutory authority.
Even assuming that the Commissioner did have power to pass upon character and fitness, the court felt that “the evidence before him was utterly insufficient to sustain his conclusion of present unfitness. An old conviction and some old arrests, without more, does not establish unfitness.” It reasoned, however, that the Commissioner “ might have the power ” to withhold the license if petitioner were likely to use it to engage in illegal activities, and hence concluded: “ Because the commissioner may be able, with diligent effort, to establish the fact of recent relevant illegal activity by applicant, and the likelihood of such activity in the future, if it should obtain a license, the proceeding should be remanded to him for appropriate action rather than to direct the granting of a license forthwith.” The Commissioner appeals from “each and every part” of the Appellate Division’s order, whereas petitioner appeals from only that part of the order which remanded the proceedings and failed to direct the Commissioner “ to forthwith issue the public cart licenses ”.
The issue before us on this appeal, as framed by the Appellate Division, is ‘ ‘ whether the Commissioner of Licenses, under the city statutes which apply to him, has the power to consider the character of an applicant for a cartman’s license, and whether, if he has such power, the information adduced supported his *307 determination.” There can be no disputing the general rule that any discretionary powers exercised by an administrative officer must be delegated to him by statute, and that such delegation must be accompanied by standards to guide the exercise of administrative discretion. With respect to licensing officials, however, it is equally well settled that the power to withhold a license for good cause, as well as the standards defining good cause, need not be expressly delegated where, by fair implication, in light of the statutory purpose, such power has been implicitly delegated. As this court noted in People ex rel. Schwab v. Grant (126 N. Y. 473, 481), in construing a provision of the New York City Consolidation Act authorizing the Mayor of New York to grant licenses to auctioneers upon the filing of a bond (L. 1882, ch. 410, ch. Y, § 113, pp. 29-30), “ The * * * act does not, in terms or by fair implication, require the mayor to grant such licenses, but, by necessary implication, confers the power to refuse them when, in his judgment, he thinks the public interest requires it. A power to grant a privilege to one is inconsistent with the possession on the part of another of an absolute right to exercise such privilege.” (Emphasis supplied.) (See, also, People ex rel. Cumisky v. Wurster, 14 App. Div. 556, 561; Matter of Barresi v. Biggs, 203 App. Div. 2, 4-5.)
In addition to the general proposition that power to grant a license necessarily implies power to withhold it for good cause, a further source of discretionary power implicitly delegated to the Commissioner is to be found in the general licensing provisions of the City Charter and the Administrative Code. Section 773 of the charter vests in the Commissioner “ cognizance and control of the granting, issuing, transferring, renewing, revoking, suspending and cancelling of all licenses and permits ”, except insofar as such powers have been placed within the jurisdiction of other officials, and subdivision c of section 773a-7.0 of the Administrative Code authorizes him “in his discretion to take such testimony as may be necessary on which to base official action * * * when investigating any matters pertaining to” the above. Applications to the Commissioner for licenses must be made “in such form and detail as he shall prescribe” (§ 773a-2.0); the term of all licenses is generally limited to one year (§ 773a-3.0); and the Commissioner “is *308 empowered to hear and determine complaints against licensees, and to suspend or revoke any license or permit issued by him ’ ’ (§ 773a-7.0).
In Matter of Rosenberg v. Moss (N. Y. L. J., Aug. 14, 1941, p. 343, col. 7 [Sup. Ct., N. Y. County], affd. 266 App. Div. 845, affd. 296 N. Y. 595) the license statute (Administrative Code, ch. 32, art. 7, § B32-46.0) made it unlawful for the keeper of a public bowling alley to allow persons under 16 years of age to bowl therein, and the moral danger, particularly to children, was strongly emphasized. It was squarely held that, in determining whether to issue a license to a bowling alley, the Commissioner was not limited to the formal requirements for a license specified in the code, to wit, citizenship, filing of a bond, and payment of the license fee, but had implied power, pursuant to the general grant of authority to take “ cognizance and control of the granting * * * of all licenses ”, to consider what effect the granting of the license would have on the public health, safety, or morals of the community. The Commissioner’s exercise of discretion in refusing to license the bowling alley at the premises for which it was sought was upheld, notwithstanding the “ bareness ’ ’ of the provisions of the Administrative Code with respect to bowling alleys.
The real question, then, is not the existence of discretionary power in the Commissioner above and beyond the mechanical requirements for a license specified in the code, but the extent of that discretionary power, i.e., what factors the Commissioner may properly consider in determining whether or not to issue a license. The Commissioner’s exercise of discretion in refusing to grant a license, if not otherwise arbitrary or capricious, may be interfered with by the courts “ only when it is clearly shown that refusal is based solely upon grounds which as matter of law may not control [his] discretion ” (Matter of Larkin Co. v. Schwab, 242 N. Y. 330, 335). Or, stated somewhat differently, ‘ ‘ Before a court may direct that a license shall be issued, it must appear, as matter of law, that no valid ground exists for its denial.” (Matter of Elite Dairy Prods, v. Ten Eyck, 271 N. Y. 488, 493.)
So far as the character and fitness of the proposed licensee is concerned, all the relevant case law in this State expressly or impliedly holds that the licensing official has implicit discretion *309 to pass upon the fitness of the applicant. In the Schwab case (126 N. Y. 473, supra), where the statute did not expressly empower the Mayor to evaluate the character and fitness of an applicant for an auctioneer’s license, as it did with respect to hotel, steamboat and railroad solicitors (L. 1882, ch. 410, ch. V, § 117, p. 30), and petitioner argued that he was entitled to a license as a matter of right upon filing the requisite bond, this court, in holding that the Mayor, in the exercise of discretion, could refuse to issue the license, wrote (126 N. Y., p. 480): “ The plain and obvious purpose of this act was to cure the evil produced by the indiscriminate admission of citizens, o'f whatever character, to pursue the business of auctioneers * # * by providing a limitation upon the number of such persons and subjecting them to a preliminary scrutiny as to their character and qualifications. The limitation upon the duration of the license [one year], and the requirement for an annual renewal of the bond, indicate an intention to bring the qualifications of the applicant under the frequent scrutiny of the mayor in order to prevent any abuses of the privileges of such license. * * * under the practical construction given to the act for nearly forty years by the authorities of the city * * * it was held that the act imposed duties upon the mayor to be performed, as well as powers to be exercised, and, by necessary implication, authorised him to protect the community by a refusal to license persons whose character and qualifications were not satisfactory to him. If this had not been effected, the act would have been inoperative and powerless for any remedial purpose.” (Emphasis supplied.)
In Matter of Picone v. Commissioner of Licenses of City of N. Y. (241 N. Y. 157) an application for a junk boat license had been denied on the grounds that the applicant had no license for a land-based junk shop and that it was desirable to limit the number of junk boat licenses since, among other things, various complaints had been made of thefts committed by licensed junk boats from vessels in the harbor. In reversing the Commissioner’s determination, this court noted (p. 161): “If an applicant for a license can show that he is a fit and proper person to engage in a licensed business under the provisions of the licensing statute the licensing officer may not arbitrarily impose limitations not contained in the statute upon his right to do business” (emphasis supplied), and held (p. 162): “As the *310 commissioner does not deny that petitioner is a fit and proper person to operate a junk boat, it follows that his action in refusing a license to the appellant was, however well intentioned, in a legal sense an abuse of discretion.” (Emphasis supplied.) It should here be noted that the ordinance did not expressly require applicants for junk boat licenses to be of good moral character (Cosby’s Code of Ordinances, 1924, ch. 14, art. 9, pp. 360-362).
In Matter of Arroyo v. Moss (269 App. Div. 824, affd. 295 N. Y. 754) petitioner’s barber license was suspended shortly after it was issued on the grounds that he had failed to disclose three misdemeanor convictions for unlawful possession of policy slips in his application for the license (he disclosed one such conviction), and had failed to appear, as directed, before the Commissioner. The applicable statute prohibited issuance or renewal of a barber’s license to felons, unless otherwise determined by the Commissioner. A rehearing was had, at which petitioner admitted all four convictions, but the Commissioner refused to reinstate the license on the principal ground that his illegal and criminal activities made him an unfit person to be the holder of a barber license, and his determination was upheld by this court.
The Arroyo decision (supra) clearly indicates that the phrase “ fit and proper person” in the Picone case (supra) was not meant to be limited to the specific provisions of the licensing statute, but encompassed the character and fitness of the applicant, as properly evaluated by the Commissioner (see, also, Matter of Larkin Co. v. Schwab, supra, p. 335). The Arroyo decision was unanimously followed in Matter of De Stasio v. Fielding (295 N. Y. 903) which involved similar facts. We reversed the lower courts “ on the authority of Matter of Arroyo v. Moss (295 N. Y. 754) ” (295 N. Y. 904), and sustained the Commissioner’s refusal to renew petitioner’s barber license because of his criminal record (seven convictions for bookmaking). It should be noted that the principal ground for the Commissioner’s refusal to renew Arroyo’s and De Stasio’s barber licenses was not because they had initially failed to disclose most of their convictions (which concealment lead to the initial suspension of licenses), but because of the particular convictions themselves. It would seem to go without saying that *311 had the Commissioner lacked power to pass upon the applicant’s personal fitness, then he would have been equally powerless to withhold licenses for a failure to disclose information relating to personal fitness.
Petitioner seeks to distinguish the Schwab and Arroyo cases (as well as other cases relied upon by the Commissioner) upon the ground that they dealt with the licensing of an individual, whereas the Public Cart Ordinance ‘ ‘ merely concerns itself with the registration of property [i.e., the trucks] rather than the licensing of the individual into a profession or skilled or unusual trade or calling. ’ ’ This is apparently what the Appellate Division had in mind when it spoke of the ‘1 bareness of the statutes with regard to the qualifications of a public cartman ”, and the lack of “ any legislative history which has been made available ”, which might suggest that the purpose of licensing cartmen ‘ ‘ was more than merely to license for purposes of identification, collection of revenue, or control of the licensees’ activities under specific regulations governing their conduct ”.
We find no merit in this argument. In People v. Horton Motor Lines (281 N. Y. 196, 203) this court pointed out that this same Public Cart Ordinance “ is one which attempts to license the occupation of public cartmen. * * * The ordinance in question is not a tax measure, but is a comprehensive scheme to license the calling of public cartmen.” (Emphasis supplied.) As previously noted, the early legislative history of New York City and its boroughs demonstrates that the calling of public cartmen has always been regarded as a vocation not open to all but subject to special license and authority, and it seems apparent that the ordinance in question was designed to license the individual cartmen and to regulate the rates they could charge, in the public interest. In City of Brooklyn v. Breslin (57 N. Y. 591, supra) the 1854 Charter of the City of Brooklyn (L. 1854, ch. 384, tit. II, § 13, subd. 4, p. 840) invested the Common Council with power to regulate the rates chargeable by public cartmen for the transportation of merchandise, and “to prohibit unlicensed persons from acting ” as public cartmen. The Common Council was further empowered to authorize the Mayor to grant licenses to cartmen, and the council thereafter passed an ordinance granting such licensing power to the Mayor. In upholding a penalty assessed against a coal dealer for carting *312 coal without having obtained a license, the Commission of Appeals, in answer to the argument that the ordinance was void “as being ‘in restraint of trade and unreasonable, unjust, restrictive, arbitrary and oppressive ’ ”, held (57 N. Y., p. 596): “ it cannot be said that the ordinance was more than a proper regulation of a particular branch of business for the good order of the city and the protection of the persons and property of its citizens and the advancement of its prosperity ”. (See, also, City of Buffalo v. Hill, 79 App. Div. 402, 406.)
The ordinance involved in the Breslin case expressly provided that applicants for a public cartman license had to be “ of good moral character ” (57 N. Y., p. 594). The ordinance here in question does not expressly require this, as it does not in the case of auctioneers (art. 21), junk dealers — including junk boats — (art. 18), or dealers in secondhand articles (art. 19), among other callings requiring a license. For the foregoing reasons, however, we think such a requirement is implicit in the necessity for a license, particularly in light of the fact that the ordinance regulates rates for the apparent purpose of preventing price gouging and related abuses. It seems clear to us that the Commissioner is not only empowered, but indeed is duty bound, to inquire into the character and personal fitness of the proposed licensee. As the court said in Matter of Dorf v. Fielding (20 Misc 2d 18, 20 [Sup. Ct., N. Y. County]), in answer to the argument that the Commissioner could not inquire into the character of an applicant for a license to deal in secondhand articles, but was limited to the facts of the applicant’s citizenship, the giving of a bond, and the payment of the license fee, ‘ ‘ A Commissioner with no more power and discretion than that would be a useless figurehead, and under such a rule the system of licensing would become, not a protection to the public, as it obviously was designed' to be, but a dangerous delusion and a snare, because it would create the impression that there had been investigation as to the fitness of licensees when, in fact, there had been no such investigation.”
With reference to the standards by which the Commissioner is to be guided, it would be “ difficult or impractical for the Legislature to lay down a definite, comprehensive rule ” by which he could determine an applicant’s character and personal fitness (Matter of Marburg v. Cole, 286 N. Y. 202, 211-212; see, *313 also, Libriszi v. Plunkett, 126 N. J. L. 17; 42 Am. Jur., Public Administrative Law, § 45, p. 345). Where, as here, the Commissioner had made a finding of personal unfitness, the scope of judicial inquiry is limited to the question of whether there is substantial evidence in the record to support his determination, or whether, on the other hand, his action is tantamount to an arbitrary or capricious abuse of discretion.
The license was denied in the instant case because a principal stockholder, officer and director of petitioner was found to be personally unfit. It cannot seriously be doubted, as noted by Special Term, that “ The character and reputation of the officers of the petitioner are decisive elements in the appraisal of the character of the corporation”, since licensing of a corporate applicant necessarily entails consideration of the qualifications of the principals through which the corporation will act. The determination of unfitness was, as noted, based on Plumeri’s conviction for extortion in 1937 “in connection with garment trucking racketeering” and his sentence to 5 to 10 years’ imprisonment. When the nature and locale of this conviction are viewed in the context of the apparent purpose of the licensing statute and the industry in which petitioner seeks to operate its trucks, it cannot be said as a matter of law that the Commissioner acted arbitrarily or capriciously in refusing to issue the licenses.
In our opinion, the Appellate Division placed undue emphasis on the age of the conviction, while the Commissioner more properly focused on the nature and locale of the crime. The conviction was for a felony, not a misdemeanor or an offense, and, more important, for the crime of extortion. When one considers that the licensing ordinance regulates the rates chargeable by public cartmen for the apparent purpose of preventing price gouging and related abuses, and hence is specifically directed against a class of offenses comprehending extortion, the- relationship between the statutory design and the integrity and trustworthiness of the proposed licensee is apparent.
Moreover, the conviction was not for criminal activities remote from the licensed business but was linked to the very industry in which petitioner seeks licenses to pursue its calling — an industry which, as both courts below have emphasized, has been infiltrated by criminal elements. The Appellate Division recognized that ‘ ‘ The garment industry, and particularly the trucking *314 aspect of it, has been a continuing source of concern to law enforcement officials in this community” (emphasis supplied), and even went so far as to say that “ The commissioner may be right ” in regarding petitioner “ as unfit or as presenting a great risk of unfitness to function as a licensed public cartman in the garment trucking business Yet the court subsequently concluded — a conclusion admittedly ‘ ‘ rendered academic ’ ’ by its holding that the Commissioner lacked power to evaluate character — that ‘ ‘ the evidence before him was utterly insufficient to sustain his conclusion of present unfitness ’ ’, notwithstanding the well-established rule that an administrative determination “ is not to be disturbed by the courts if it has ‘ warrant in the record ’, ‘ a reasonable basis in law ’ and is neither arbitrary nor capricious. * * * The ‘ judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body. ’ * * *” (Matter of Park East Land Corp. v. Finkelstein, 299 N. Y. 70, 75.)
Once it is conceded that the Commissioner can properly evaluate an applicant’s character and fitness for a public cart license, it cannot be held as a matter of law that there was no “ reasonable basis for [his] considered judgment ” that Plumeri’s past criminal record “ was incompatible and inconsistent with the responsibilities assumed by a licensed [cartman] under the [Public Cart Ordinance] ” (Matter of Wager v. State Liq. Auth., 4 N Y 2d 465, 468). As this court noted in the Schwab case (126 N. Y., supra, p. 482): “ In the government of the affairs of a great municipality many powers must necessarily be confided to the discretion of its administrative officers, and it can be productive only of mischief in the treatment of such questions to substitute the discretion of strangers to the power in place of that of the officers best acquainted with the necessities of the case and to whom the legislature has specially confided their exercise.”
Petitioner makes several other contentions, not discussed by the Appellate Division, which may be briefly disposed of. It first contends that the language used in the ordinance that the Commissioner “ shall issue a license to the owner of the public cart together with a plate ” upon payment of the license fee (§ 3332-95.0, entitled ‘1 License plates; term”) constitutes a mandatory legislative direction. This argument assumes the *315 answer to the very question at issue, namely, whether the Commissioner has been impliedly vested with discretionary powers above and beyond the mechanical requirements for a license prescribed by the licensing ordinance. As this court noted in Matter of Dr. Bloom Dentist, Inc., v. Cruise (259 N. Y. 358, 362, 364, appeal dismissed 288 U. S. 588), where the applicable ordinance provided ‘1 All permits for illuminated signs shall be issued by the City Clerk, upon application therefor * * * ”:
“In issuing permits under section 215 of the municipal ordinance, the City Clerk is not intended invariably to act as an automaton. If a permit may lawfully be issued, he is the officer designated for that purpose. Here is an instance where the word ‘ shall ’ ought not to he interpreted in a mandatory sense. (Matter of Thurber, 162 N. Y. 244; Matter of State of New York, 207 N. Y. 582.) ” (Emphasis supplied.) It seems apparent that the word “ shall ” merely empowers the Commissioner to issue a license, and does not mandate him to do so in the case of an applicant found unfit.
Petitioner also contends that, since it has obtained State registration plates for its trucks pursuant to the Vehicle and Traffic Law, a city official cannot deny a State-licensed truck the right to operate on city streets. In effect this argument is but an elaboration of the contention previously considered that the Public Cart Ordinance deals merely with the registration of property, and not with the licensing of an applicant into a trade or calling. As noted, the ordinance in question “ is a comprehensive scheme to license the calling of public cartmen ” (People v. Horton Motor Lines, 281 N. Y., supra, p. 203), and there can be no question as to the city’s power to license particular vocations “ for the good order of the city and the protection of the persons and property of its citizens and the advancement of its prosperity ” (City of Brooklyn v. Breslin, 57 N. Y., supra, p. 596). The complete answer to petitioner’s argument is section 54 of the Vehicle and Traffic Law which expressly provides that “the power given to local authorities to license and regulate vehicles offered to the public for hire * # * and all ordinances * # * enacted in pursuance of such powers shall remain in full force and effect” (emphasis supplied).
Finally, petitioner argues that it is engaged in interstate commerce and hence the cartman licensing statute cannot eonstitu *316 tionally apply to it. There is. no factual basis in the record for this claim, and in any event petitioner has no standing to raise it in this proceeding. It is seeking to compel the Commissioner to issue it public cartmen licenses, and the necessary theory of the proceeding is that the city ordinance applies to it. If it is not required to be licensed, then it cannot compel the Commissioner to perform an idle act. The same may be said of its contention that it is a contract — not a common — carrier, and hence is not required to be licensed (see People v. Horton Motor Lines, supra, and cases cited therein). Petitioner concedes that it did not institute this proceeding “ to prove that [it] was not required (for one reason or another) to obtain public cart licenses for its trucks ” and that it accepts the Commissioner’s claim “ that public cart licenses-were required for its trucks ”. The only reason it assigns for arguing that it is a contract carrier engaged in interstate commerce is to rebut the Commissioner’s “makeweight argument” before the Appellate Division “ that he was entitled to deny the license on the ground that the applicant has already been engaged illegally in conducting a carting business without having first obtained a license. ’ ’ As noted by the Appellate Division, in dismissing this argument of the Commissioner, ‘ ‘ there is insufficient support in the record for the contention and it was never a part of the assigned bases for his determination, or of the pleaded answer in this proceeding”, and the Commissioner has not advanced the argument on this appeal.
The order appealed from should be reversed, and the order of Special Term dismissing the petition reinstated, without costs to either party.
Chief Judge Conway and Judges Desmond and Burke concur with Judge Froessel; Judges Dye, Fuld and Van Voorhis dissent and vote to affirm and to direct the issuance of cartmen’s licenses to petitioner.
Order reversed, etc.