In the Matter of the PLAYBOY CLUB OF NEW YORK, INC., Respondent, *v.* BERNARD J. O'CONNELL, as Commissioner of Licenses of the City of New York, Appellant.

First Department, April 11, 1963.

*Leo A. Larkin, Corporation Counsel* (*Rose Schneph* and *John F. Kelly* with him on the brief), for appellant.

*Stanley H. Lowell* of counsel (*Howard M. Squadron* and *Lawrence H. Rogovin* with him on the brief; *Squadron, Alter & Weinrib* and *Corcoran, Kostelanetz, Gladstone & Lowell,* attorneys), for respondent.

*Jacob M. Usadi* (*Stanley D. Halperin* and *Louis Perlmutter* with him on the brief), attorney for New York Civil Liberties Union, *amicus curiæ.*

BOTEIN, P. J. The Administrative Code of the City of New York makes it unlawful to operate a cabaret except in premises licensed for the purpose (§ B32–297.0). Respondent, proposing to open a cabaret at 5 East 59th Street in the Borough of Manhattan, applied to the Commissioner of Licenses of the City of New York for a license. After taking testimony upon such application, as authorized in the Commissioner's discretion by section 773a–7.0 of the code, the Deputy Commissioner submitted an adverse report, and the Commissioner, agreeing with it, denied the application. Special Term has granted an order under article 78 of the Civil Practice Act setting aside and annulling the Commissioner's determination and directing the issuance of a license; and from this order the Commissioner appeals.

Respondent, a New York stock corporation, is a wholly owned subsidiary of Playboy Clubs International, Inc. (International). Hugh M. Hefner and HMH Publishing Co., Inc. (HMH) together own 50%, and Victor A. Lownes III 25%, of International's stock. Approximately 80% of the stock of HMH, which is the publisher of the magazine *Playboy,* is owned by Hefner. Hefner and Lownes are respectively the president of International and the president of respondent. Both testified before the Hearing Commissioner. The remaining witness was a Mrs. Kerster, supervisor of respondent's female personnel.

Respondent's establishment was planned as one of a chain of cabarets, called Playboy Clubs, operated in substantially the same fashion in a number of large cities and directly or indirectly owned by International or franchised by it. The clubs, as represented by respondent, " feature the sale of alcoholic beverages and food and the furnishing of entertainment in a distinctive atmosphere." Admission to the clubs is obtained by purchase of a Playboy key for the sum of $25 or payment of an equivalent charge. One of the attractions of the clubs is that the price of a meal is the same as a drink, $1.50, although in respondent's club a room has also been set aside for the service of a more

elaborate dinner at a fixed price of $15. Another item of appeal is that the entertainment is designed to be almost continuous, to which end, in respondent's club, shows will be performed at staggered times in three of the rooms. A third inducement to patronage, and a critical one upon this application, is that the "clubs are staffed with girls, called 'Bunnies', who are attired in brightly colored bunny costumes, greet entrants into the clubs, check their key status, and serve the food and beverages." These Bunnies, most of whom are waitresses, are between 18 and 25 years of age, and respondent employs about 125 of them. Their weekly wage is $50, but their gross earnings run from $200 to $350, the excess over the wage consisting of tips. The garment they wear was described by Mrs. Kerster as similar to an all-in-one, strapless bathing suit fitted up high on the thigh. While it reveals the upper part of the breasts, Lownes testified that at no time "does any costume fit any girl in such a manner, whatever position she was in as to expose any portion of the nipples." The décor of the clubs, stated to be luxurious, includes displays of cartoons and transparencies which portray nude and semi-nude women.

The essential basis of the Commissioner's adverse determination was apprehension that the waitresses in respondent's club would mingle with the patrons in violation of the following regulation of the Department of Licenses: "Rule 6(i). Mingling. Female entertainers and female employees of a cabaret shall not be permitted to mingle with patrons or guests." Power to adopt the regulation is not questioned (see Administrative Code, § B32–305.0), nor is its wisdom assailed. It has the force and effect of statute and we are required to take judicial notice of it (Administrative Code, § 982.8.0; *Matter of Bethlehem Steel Co.* v. *Joseph,* 284 App. Div. 5, 8).

Respondent stresses that the Commissioner's regulations govern licensees, not applicants. As I understand respondent's argument, the Commissioner may not invoke the regulations to anticipate infractions which may never eventuate (*Matter of Beck* v. *Wallander,* 189 Misc. 509). Logically, the reasoning runs, the restraining regulations may therefore be applied only to licensees, since valid and trustworthy findings of violations can be based only upon actual experience in the operation of a cabaret.

Under the applicable statutes the Commissioner must be satisfied, among other things, that the applicant is a "fit and proper person", and that the premises are a "safe and proper place" to be used as a cabaret (Administrative Code, § B32–297.0, subd. d). It seems to us clear that in considering an application

the Commissioner must of necessity take into account the possibility of infractions of his regulations. How close or likely the possibility must be to armor an adverse determination against a charge of arbitrariness is another question; and the answer will depend on particular facts. When a licensing officer grants an application, he does so because in his judgment the possibility of its abuse in the future is nonexistent or sufficiently remote to negative undue risk of abuse. When he denies an initial application by reason of an applicant's notorious criminal record, for example, or when he denies a renewal application by reason of misconduct during the expiring term, he does so because in his judgment these circumstances turn the possibility of future abuse into a reasonable probability or create an undue risk of future abuse. To weigh the possibilities may or may not be easy, but as we have said, although in a different context, an administrative official "must take cognizance of the purpose to which the license is to be put" and he "is not obliged to, and should not, grant a license which would result in the use of the license in violation of law" (*Matter of Barton Trucking Corp.* v. *O'Connell*, 7 A D 2d 36, 39, revd. on other grounds 7 N Y 2d 299; cf. *Matter of Rosenberg* v. *Moss*, 296 N. Y. 595).

Nor, in the present case, do we deem of moment the Commissioner's failure to specify whether he was applying the "fit and proper person" standard or the "safe and proper place" standard or both. If an applicant intends to permit mingling, he cannot be a proper person, for he intends to encourage illegality. If his intentions are otherwise (and disregarding the point that objective facts may belie professed intentions), the Commissioner may still reasonably find that a proposed method of cabaret operation carries with it an undue risk of mingling. In such event, he indulges in no unwarranted interpretative stretch, if any, should he conclude the premises are not a safe and proper place. The purpose of the legislation is undermined if the place is to be judged without a sensible regard to its activities. In *Matter of Agoglia* v. *Mulrooney* (259 N. Y. 462), one of the circumstances influencing denial of a cabaret license was the propinquity of the premises to a school. We question that the case would have been decided differently had the school been distant but the premises already provided an amusement haven for children. Again, we do not agree that in exercising his discretion the Commissioner invoked neither of the two standards, but rather an unauthorized and nebulous one of "public interest". His statement that "this innovation would not be in the public interest" plainly related to his conclusion about the prospective breach of his regulations; he was in effect making the funda-

mental observation that any violation of the statutes and implementing regulations would not be in the public interest.

Whether the finding of prospective breach is sustained by the weight of the evidence is of course beyond our province to determine (*Matter of Doherty* v. *McElligott,* 258 App. Div. 257, 259). Our inquiry into the Commissioner's exercise of discretion " is limited to a determination whether the record discloses circumstances which leave no possible scope for the reasonable exercise of that discretion " (*Matter of Wager* v. *State Liq. Auth.,* 4 N Y 2d 465, 468). Accordingly, we must consider whether the Commissioner's action, following a hearing he granted in his discretion, was based " upon a ground which is not supported by any evidence " (*Matter of Small* v. *Moss,* 277 N. Y. 501, 507).

That respondent solicited patronage in New York is not disputed. Placed in evidence were copies of three 1962 issues of a leaflet entitled " Playboy Club News ", which contain information concerning the clubs and invite purchase of club keys. The Summer issue was distributed to New Yorkers generally, the later issues to New Yorkers who had purchased keys; all three referred to the planned opening of respondent's club. A photograph in the November issue shows three Bunnies engaged in dance with three men, evidently patrons, since the caption reads: " Swinging twist parties are also available; a topsy-turvy time for all." Another photograph showing a man with his arms around two Bunnies bears the caption: " Club private parties are fancy-free fun as evidenced above." The issue also includes two other photographs, each of which shows a patron in like physical contact with a Bunny. The December issue, which suggests a key as a Christmas gift, includes a photograph — between the headline: " Give your holiday party at the club " and the caption: " An end-of-the-year Playboy Club private party is always the living end " — which again shows three Bunnies and three males dancing. Pertinent to consideration of these photographs, which obviously depict mingling, is the following interrogation of Lownes: " Q. When photographs are taken, may a bunny pose in the photograph with the guest? A. Yes, she can have her picture taken with the guest but she is not permitted to have the guest touch her during the picture-taking."

That mingling is permitted in the clubs in other States does not necessarily mean that respondent intended to permit it in New York (cf. *Matter of Beck* v. *Wallander,* 189 Misc. 509, *supra*). But here we think the Commissioner could reasonably infer that the Playboy Club News induced and was designed to induce its recipients to believe that mingling would be permitted

in the New York club. Furthermore, Lownes, when asked to compare the method of operation of the New York club with that of the other clubs, answered, "Substantially the same * * * the clubs are essentially operating in the same manner." Moreover, all three issues of the Playboy Club News indicated that the clubs were available for private parties, where patently the possibility of mingling is less remote, and Lownes confirmed that such parties could be arranged to be held at respondent's premises with Bunnies present as waitresses, entertainers and camera girls. We are unable to say it would be arbitrary for a licensing officer to conclude that mingling was to be allowed intentionally in respondent's premises or in any event that there was undue risk of its occurrence.

Again, of course, it does not follow that this evidence establishes, or in order to sustain the Commissioner's determination need establish, with impregnable certainty that respondent actually intended to permit mingling in the New York club. Perhaps the alluring representations about mingling of patrons and Bunnies were false. If so, then respondent is truly pinioned on the horns of a dilemma. If it did not intend to perform the enticing promises of mingling held forth in advertising material and articles, such deception would supply devastating proof of respondent's lack of fitness to secure a cabaret license.

Nor are we able to say, notwithstanding the absence of any issue of lewdness or obscenity, that in pondering the foregoing evidence the Commissioner, head of a department familiar with the bibulously gay night club milieu, was required to bar from consideration the elements of costume and décor above mentioned; and that it was irrelevant for him to note that the waitresses, wore, instead of the conventional dress of their occupation, the skirtless and décolleté attire described by Mrs. Kerster. Significant was the endeavor of respondent's counsel, not wholly successful, to show through Hefner that on the opening night of respondent's club (which commenced business as a restaurant only during the period of the hearing) the number of male diners unaccompanied by women was small. "Q. Would you say that over 95% of the people who came to the Club on Saturday night were couples? A. There were a great many couples. Q. Have you any kind of figure for the benefit of the Commissioner? A. There were a great many; well over 50% were couples."

Respondent brought out at the hearing that the clubs in other cities had received no complaints about misconduct on their premises. But if mingling took place there, as the Playboy Club News indicates, the absence of complaints tends to prove at

most the irrelevancy that in other jurisdictions the activity was lawful; if it was unlawful, its toleration is hardly a factor in respondent's favor. It was pointed out also that the waitresses receive a printed '' Bunny Manual '' which contains rules guarding against misconduct, and that the clubs employ a detective service whose operatives from time to time keep the waitresses under surveillance and try to detect them in infractions, as by the device of trying to make dates with them. But, again, if mingling goes on, the Commissioner could reasonably infer that the rules, which do not in terms reach the type of conduct evidenced by the photographs, are flexibly interpreted and the surveillance not intended to be directed toward mingling. Doubtless the possibility of intervention by a detective may act as a deterrence upon patrons who are informed of it. The Commissioner's view that it is insufficient to impart such information by press release was within the scope of the latitude afforded him as a finder of the facts.

It is evident that the Commissioner regarded the Bunny Manual with skepticism, as something less than a finishing school code for young ladies. His deputy's report referred particularly to a section entitled: '' That ' Extra ' Service '', which gives suggestions for promoting a greater consumption of liquor and states that '' The key to selling more drinks is *Customer Contact* '' and that '' our keyholders expect ' the personal touch ' in their every dealing with Club personnel ''. That this section, standing alone, was designedly equivocal seems to us an unreasonable conclusion. Yet on the entire record we cannot say that such an inference would lack rational support. The manual explains to the waitress that every detail of the club is designed '' to suggest the warmth, the intimacy and the fun of a private cocktail party '', and she is instructed to stop to chat with a keyholder and his party if time and trade permit. The manual informs her that patrons will treat her with more deference and respect than is generally accorded a waitress, '' For you are far more than a waitress. You are very much involved in an activity that comes closer to being ' show business ' than anything else.'' It tells her about the *Playboy Magazine,* which, it explains, is aimed '' at the young urban man who appreciates the pleasures of an apartment, the sound of hi-fi, the taste of a dry martini '', and it states that '' we depend on our Bunnies to express the personality of the magazine in a most positive way.''

The issue of that magazine in evidence, which advertised the opening of the New York club, contains stories, articles, service features, reviews and other prose pieces, a number by well-known writers; it also includes a page of '' party jokes '' (e.g., '' The

wondrously stacked blonde appeared at her door in a strapless evening gown that defied gravity. ' Terrific! ' said her admiring escort. ' I don't see what holds that dress up! '—' Play your cards right and you will ' she murmured ''). Numerous cartoons and photographs also heavily stress female nudity. This was the magazine whose personality the Bunnies were exhorted '' to express * * * in a most positive way.''

As Hefner correctly wrote in the magazine, nudity and obscenity are not synonymous. But the issue here relates to mingling, not obscenity. The question for the Commissioner was whether young waitresses, relying on tips for the bulk of their earnings, would understand or were really expected to understand that mingling was forbidden. The answer, either way, might be of some assistance to him in exercising his discretion, and we cannot say that his negative answer lacks any reasonable basis. Pertinent here, too, is the interrogation of Lownes above quoted.

'' That an unsupervised cabaret offers a tempting field for abuses and crimes is almost axiomatic '' (*Matter of Friedman* v. *Valentine*, 177 Misc. 437, 439, affd. 266 App. Div. 561). Supervision is entrusted to a licensing officer by code provisions so stringent as to require or authorize the taking of fingerprints of applicants and their employees (§§ B32–297.0, B32–304.0). Within the range of the powers granted and the standards set for him, he has latitude for the exercise of discretion, subject to the limitation that he may not act arbitrarily or out of caprice. His is the task of measuring probabilities and risks; and while cabaret operation may not be one of the great regulatory areas it would be reckless indeed to assert that it affords no room for the acquisition and play of administrative expertise and embraces no features obscure to judicial sight. As the Court of Appeals has admonished more than once: '' In the government of the affairs of a great municipality many powers must necessarily be confided to the discretion of its administrative officers, and it can be productive only of mischief in the treatment of such questions to substitute the discretion of strangers to the power in place of that of the officers best acquainted with the necessities of the case and to whom the legislature has specially confided their exercise '' (*People ex rel. Schwab* v. *Grant*, 126 N. Y. 473, 482; *Matter of Barton Trucking Corp.* v. *O'Connell*, 7 N Y 2d 299, 314, *supra*). We cannot discover caprice or arbitrariness in appellant's determination.

A secondary reason for denial of the application appears to have been false advertising concerning admission to respond-

ent's club and the price of meals. We do not consider this reason, in view of the strong support afforded by the record to the other grounds for the Commissioner's action. Rejection of this reason could offer respondent scant comfort, since assuming *arguendo* it was without basis, "Before a court may direct that a license shall be issued, it must appear, as matter of law, that *no* valid ground exists for its denial" (*Matter of Pruzan* v. *Valentine*, 282 N. Y. 498, 506; *Matter of Elite Dairy Prods.* v. *Ten Eyck*, 271 N. Y. 488, 493). Nor need we consider it on the theory that where the exercise of discretion is involved the possibility exists that a finding without reason on one branch of a case may have actually distorted seemingly justified judgment on a second. Clearly this particular assertion of false advertising was a minor and subordinate ground.

The order appealed from should be reversed, on the law, and the appellant's determination reinstated, with costs.

STEVENS, J. (dissenting). Petitioner, the operator of a restaurant and club at premises 5–7 East 59th Street, Borough of Manhattan, sought a cabaret license for the premises. The application was denied and petitioner-respondent (herein petitioner) instituted an article 78 proceeding which resulted in an order annulling the determination. The majority are now reversing the order appealed from and reinstating the determination of respondent-appellant, Commissioner (herein appellant).

The majority say the essential basis for denial of the license is the appellant's apprehension that there would be mingling of waitresses (called Bunnies) and entertainment personnel with the customers. They hold that appellant may properly consider the possibility of such infraction of regulations, and the resulting apprehension on appellant's part constituted a reasonable basis for denial of the application for a cabaret license.

After the application for a license was filed, a hearing was held. At the conclusion of the hearing the Deputy Commissioner before whom the hearing was held made a report to appellant in which he referred to the contents of various issues of "The Playboy Club News" (a publication of Playboy Clubs International, a corporation separate from applicant though some personnel are common to both), the proposed costume of the waitresses, or Bunnies, the possibility of mingling, and concluded "it would not be in the public interest to grant a license." He recommended to appellant that the license be denied.

Appellant in his determination, which is the basis of this proceeding, refers to the policy against mingling, asserts that peti-

tioner's "main appeal to its prospective customers is the lure of its scantly-clad waitresses", and similarly concludes that to grant a license would not be in the public interest.

Before examination of the grounds upon which the refusal was based, it is well to look to the source of appellant's power. The appellant has jurisdiction to issue licenses for cabarets (Administrative Code of City of New York, § B32–296.0 *et seq.*). Certain conditions precedent must be met before the license is issued. "A license shall be issued only after the commissioner (1) is satisfied that the applicant is a fit and proper person, (2) shall have caused an inspection to be made of the premises to be licensed and is satisfied that such premises comply with all laws and rules and regulations of the department of buildings, the fire department, the health department, and the department of water supply, gas and electricity, insofar as the same are applicable thereto, and (3) is satisfied that the premises to be licensed are a safe and proper place to be used as a public dance hall, cabaret or catering establishment. For the purpose of facilitating the inspections prescribed by this section, the commissioner is authorized to call upon the head of any city agency and such agency and its employees shall make such inspections as may be required." (Administrative Code, § B32–297.0, subd. d.)

No question is raised under paragraph (2) of subdivision d of section B32–297.0, so no further discussion need be devoted to it.

Under the section and subdivision quoted two items remain for resolution by the appellant prior to the issuance of a license. The appellant must be satisfied the petitioner is a fit and proper person, and the premises must be a safe and proper place for a cabaret.

The issue thus presented on this appeal is a narrow one. In the absence of a determination that petitioner is not a fit and proper person, or that the premises are not safe and proper for the use intended, does a denial of the application, for the reasons stated, on the expressed ground that to grant same would not be in the public interest, constitute a reasonable basis for refusal within the meaning of the law.

"Mingling", to which appellant referred, may be construed to mean fraternizing with the customers or patrons. It is forbidden by the Rules and Regulations of the State Liquor Authority, and may constitute grounds for revocation of the license. Petitioner has a liquor license which, from the record, has neither been revoked, nor proceedings taken toward that end. It is persuasive, therefore, that mingling between patrons

and Bunnies, who are now actively employed in the premises, has not occurred. There remains the prospect of mingling between patrons and entertainers, prospective employees, should the cabaret license be granted. It is doubtful that the mere existence of the prospect is reasonable grounds for the action taken by appellant.

The appeal of the '' scantily-clad waitresses '' to the patron doubtless does exist. Every place of entertainment, and even some without, which employs females may have levelled against it the charge of feminine appeal as an added inducement to patronize the establishment. The garb, or lack of it, is an undeniable factor. It is reasonable to suppose, and one might say it is common knowledge, that at least a part of any cabaret's attraction lies in the costume of its chorus line or entertainers, including the somewhat abbreviated costumes occasionally worn.

The difference in the case before us, however, is that these costumes remind the observer of or seek to identify the wearer with an animal, especially one noted for reproductive prolificness, to wit, a bunny. One might even view this as an affront to the human personality, and for that reason objectionable. Whatever one's views are on the matter, a personal antipathy is not a sound basis upon which to rest an administrative determination. Petitioner can claim no right to preferential treatment, but it is entitled to have its application evaluated on such objective criteria as are applied to other applications of a similar nature.

Possibly the hearing produced information which would refute any contention of unequal treatment, and upon which the relevant and necessary factual findings could properly have been made. This, however, was not done. The determination was premised upon the nebulous phrase '' the public interest '' with appellant as the sole arbiter of the meaning of the language. When a determination is so based it should be related to the customs, usages, mores, laws and moral tone of the times. Before conclusive action is taken assertedly in the public interest, specific and concrete findings with respect to the aforementioned factors should be made. This is especially important in matters of this nature, where the scope of judicial review is so limited. A more precise and readily definable standard, based upon findings which permit of objective review, is desirable. Unless that is done we may find that a subjective determination of evidentiary matter has been confused with an objective finding in order to reach a predetermined result.

The record discloses that in places where Playboy Clubs are in operation they have operated within the laws of the respective

jurisdictions. While that is not determinative of the issue here, it is a factor which should be considered in light of petitioner's asserted willingness to comply with all applicable laws, rules and regulations of this jurisdiction. Indeed, albeit under protest, it has modified its rule in reference to admissions because of the ruling of the State Liquor Authority.

The club and restaurants, sans cabaret entertainment, are presently in operation, presumably with Bunnies as waitresses, and apparently without disorder. This might be illustrative of the fact that what to one observer may be sensually provocative (i.e., the bunny costume), may be to another an attempted juvenescent compensation. Of course the converse is true. Much depends upon the mind of the beholder and the setting in which the revelation occurs.

Any rule or regulation of appellant adopted in accordance with the powers conferred (Administrative Code, § B32-305.0) has the force and effect of law. Appellant is given the power to revoke or suspend a license '' for any violation of law, or upon the ground that disorderly, obscene or immoral conduct is permitted on the licensed premises, or for other good cause '' (Administrative Code, § B32-306.0). Such language imports a condition that the premises be in operation prior to application of the rule and the finding of violation.

Appellant may refuse to issue a license, but such refusal must be in accord with the law as declared or reasonably implied. Appellant should not create or establish a new standard independent of those enumerated. In the absence of a finding that petitioner is not a fit or proper person, or that the premises are not a safe and proper place, to conclude that petitioner's conduct would be violative of law is to prejudge the matter without a reasonable basis therefor.

The use of the words '' fit and proper '' and '' safe and proper '' is intended, legislatively, to establish standards, the application of which must depend upon precedent factual findings, not upon eventualities. The record is inadequate to support the determination made because of the absence of such factual findings. Such deficiency does not permit effective judicial review.

It is not the court's function to make findings for the appellant even if it could do so, and since appellant's action may be overturned only if it is arbitrary, the matter should be remanded to him for reconsideration and the making of appropriate findings if in his opinion the present state of the record so permits, or he may deem it advisable to hold further hearings. It is no solution to the problem to substitute our judgment for the supposed

standards applied by the appellant, and indeed it might be highly improper to do so. The real difficulty is that the appellant has not on the one hand stated valid grounds supported by the record or on the other hand stated grounds permitted by the statute. Since there may be statutory grounds supportable by the record the matter should be available for him to review.

I therefore dissent and vote to reverse and remand.

McNALLY and EAGER, JJ., concur with BOTEIN, P. J.; STEVENS, J., dissents and votes to reverse and remand in opinion, in which BREITEL, J., concurs.

Order entered on or about January 18, 1963 reversed, on the law, with $20 costs and disbursements to the respondent-appellant, and the determination of the respondent-appellant, Commissioner of Licenses of the City of New York, reinstated.