Irving H. Saypol, J.
In this proceeding (CPLB art. 78) the petitioner moves for judgment directing the respondent Superintendent of Insurance to approve the proposed amendment of petitioner’s charter authorizing (1) an increase of its guarantee capital from $6,000,000 to $10,000,000, (2) the number of its authorized guarantee capital shares from $3,000,000 to $5,000,-000 and (3) directing the respondent to limit his review of the proposed amendments under section 53 (subd. 1, par. [d]) of the Insurance Law to assure that the proposed amendments comply with the provisions of that section and that the respondent should not interfere with the business judgment of the petitioner’s board of directors except as expressly authorized by statute. The petitioner’s original charter when it was incorporated in 1850 provided for a guarantee capital of $100,-000, represented by 2,000 shares, each having a par value of $50 with one vote in the election of the board of directors. The shareholders were entitled to share % of net profits after payment of a maximum of 7% interest on all these shares, subsequently limited to $7,000 on the first $400,000 and 3% on the remainder.
By 1950 the petitoner had accumulated undistributed profits allocable to holders of guarantee capital shares aggregating approximately $347,000 to which the shareholders had a vested right according to section 14 of the petitioner’s charter which allocates profits, 7/8 to policyholders and % to shareholders.
Legislation was enacted in 1950 to enable the capitalization of the accumulated profits and this object was effected by the addition of subdivision (d) of section 52 of the Insurance Law and paragraph (d) of subdivision 1 of section 53, effective April 15, 1950. Thereupon the petitioner submitted to the New York Insurance Department an amendment to its charter which was officially approved and filed on June 26, 1950, including in section 33 thereof the following language: ‘ ‘ The Guarantee Capital of the Company may be increased indefinitely in the manner provided by paragraph (d) of subdivision 1 of Section 53 of the Insurance Law of the State of New York.” Since then six additional applications for amendment containing that language have been filed by the petitioner after receiving the indorsement of the Superintendent of Insurance. Pursuant to those amendments the authorized guarantee capital is now $6,000,000, represented by 3,000,000 shares of the par value of $2 each.
*360 The rejected application would increase the guarantee capital to $10,000,000 and the guarantee capital shares to 5,000,000, each of the par value of $2. It is that disapproval which is now under review. The application embraced also a change in the directorships which was approved. Otherwise the letter of October 10, 1968 disapproving the increase in guarantee capital and shares stated:
It appears that Manhattan Life Insurance Company was incorporated on May 29, 1850. Its charter then provided for a Guarantee Capital of $100,000 represented by 2,000 shares having a par value of $50.00 each. The charter also provided that the shareholders were entitled to one vote per share in the election of directors. It further provided that in each year in which there is a distribution of dividends to policyholders, the shareholders were entitled to 7% interest on the outstanding Guarantee Capital and %th of the distribution of dividends to policyholders.
¡Since then, the charter has been amended a number of times. It presently provides for an authorized 'Guarantee Capital of $6,000,000 represented by 3,000,000 shares with a par value of $2.00 each; the fixing of the number of votes to be east by the shareholders at 720,000; and that the annual interest on such Guarantee Capital is $7,000 on the first $400,000 and 3% on the excess thereof. The %th of the distribution of dividends to policyholders remains unchanged.
The increases in Guarantee Capital emanated from a decision by the directors in 1950 to pay the shareholders the profits partly in cash and partly in additional shares. With each increase, there has been an increased interest cost to the company. Each increase in the number of outstanding shares has further diluted the voting power of the policyholders. In 1964, by charter amendment, the maximum number of shareholders’ votes was fixed at the 720,000 figure previously mentioned. The maximum number of votes of the policyholders would appear to total about 160,000. This disparity in voting strength is an anomolous situation where the affairs of a mutual insurance company are not controlled by its policyholders in accordance with the basic concept of a mutual insurance company, but, rather, are controlled by the shareholders.
Under the circumstances, Section 57 of the Insurance Law provides, in addition, that “ Every domestic mutual insurance corporation shall be organized, maintained and operated for the benefit of members as a non-stock corporation”. Since it appears that the proposed amendment increasing Guarantee Capital would result in an additional increase in the interest cost to the company and would, therefore, be detrimental to the interest of policyholders, approval of the proposed amendment cannot be granted.
Thus, principally, the disparity in voting strength and increased interest cost animated the rejection.
Subdivision (d) of section 52 of the Insurance Law provides: 1 ‘ Any domestic insurance corporation heretofore incorporated under the provisions of any general or special law of this state and doing business as an authorized insurer at the effective date of this chapter, shall be subject to the provisions of this chapter relating to such a corporation, except as follows: *361 * * * (d) If it has a guarantee capital -represented by shares, it may amend any of the provisions of its charter.” (Emphasis supplied).
Paragraph (d) of subdivision 1 of section 53 provides: “ (d) Notwithstanding any other provisions of this section, if it has a guarantee capital represented by shares, it may amend any of the provisions of its charter, including, without limitation, the increase, reduction or retirement of its capital and the interest thereon and the increase or decrease in the number or par value of the shares representing its capital, upon the filing in the office of the superintendent, with his approval endorsed thereon, of a certificate setting forth such amendments which shall become effective upon such filing. The certificate shall have been approved by its board of directors or trustees and consented to by the holders of at least two-thirds of its outstanding shares. Such consent shall be given, either in person or by proxy, in writing or by vote at a meeting held on at least twenty days notice. Any holder of shares of guarantee capital not in favor of any such increase, decrease or retirement, who signifies such objection in the manner prescribed by section six hundred twenty-three of the business corporation law, shall have his rights determined in accordance with the provisions of said section six hundred twenty-three of the business corporation law.” (Emphasis supplied.)
It would appear therefore that the action of the respondent is ministerial and his function is to assure only that there has been compliance with statutory procedure. This is evidenced further by the concludng sentence of paragraph (d) of subdivision 1 of section 53 which reads: ‘ ‘ All the provisions of section one hundred ninety-five shall apply to the payment of any cash dividends from profits to the holders of shares of such guarantee capital.” This is so for if more than ministerial action was intended the inclusion of the following last-quoted sentence of the section would not have been necessary, since section 195 of the Insurance Law provides: “No domestic stock life insurance company shall pay any cash dividend to its stockholders unless a notice of its intention to declare such dividend and the amount thereof shall have been filed with the superintendent not less than thirty days in advance of such proposed declaration, nor if the superintendent within thirty days after such filing gives written notice to such company of his disapproval of such payment, on the ground that he finds that the financial condition of the company does npt warrant the payment of such dividend.” (Emphasis supplied.) People ex rel. Schwab v. Grant (126 N. Y. 473) and Matter of *362 Guardian Life Ins. Co. v. Bohlinger (284 App. Div. 110, affd. 308 N. Y. 174) relied .on by the respondent, are inapposite for the statutes there involved embodied standards and guidelines which, of course, create an area of discretion in reaching final action. The statute here involved is not one of permissive action within stated standards and guidelines. Bather it authorizes charter changes without limitation when the proposed applications conform with statutory procedures.
As already indicated, the petitioner is unique among mutual insurance corporations in that it has shareholders as well as policyholders. Nevertheless, it has been regarded by the respondent in its dealings with the petitioner as a mutual company. Yet respondent argues that the proposed amendment violates section 57 of the Insurance Law, which requires that mutual insurance companies must be organized, maintained and operated solely for the benefit of their policyholders. This claimed violation disregards the legislative history of petitioner’s organization, its changes and growth and the precedential treatment in past dealings with the Department of Insurance. Further, the argument assumes that the present proposed amendment, unlike the prior six amendments, would work to the petitioner’s disadvantage, yet that implication is not shown. While petitioner may be treated as a mutual insurer for certain purposes (1942 Opns. Atty. Gen. 295-297) the intent of the Legislature in enacting subdivision (d) of section 52 and paragraph (dj of subdivision 1 of section 53 of the Insurance Law in 1950, together with the actions of the respondent in approving the prior amendments demonstrates that the petitioner has been treated as a mutual company because of its origin and that any action benefiting the shareholders is not necessarily unlawful. Indeed, the successive capitalizations of accumulated profits have given to the shareholders increased interest in the favorable and profitable operation of the company and any benefit -or detriment would affect the shareholder as well as the policyholder.
Assuming, however, that there is an unfettered discretion in the respondent in this area, yet the action has been arbitrary and without sound ground to support it.
Petitioner, was organized in 1850 under section 52 of the Insurance Law (L. 1849, ch. 308). By 1950 it had accumulated undistributed profits of approximately $347,000 reserved for holders of guarantee capital shares as their one-eighth participation in profits. It was the Department of Insurance *363 which suggested disposal of the accumulated profits. This could be accomplished by charter amendment to effect capitalization of the accumulations then and in the future. To that end, legislation was necessary and the department supported the proposed legislation which was enacted effective April 15, 1950. In its memorandum to the Governor, the Department stated:
“ This company [Manhattan] was incorporated in accordance with Chapter 308 of the General Laws of 1849 and is the only insurance company which has a guarantee capital represented by shares which were authorized by those laws. * * *
“In the early days of its existence it was considered to be a 1 mixed ’ corporation. However, in an opinion dated September 14, 1942, Attorney General Bennett, relying upon the act of incorporation, reached the conclusion that the Manhattan Life Insurance Company was a mutual life insurance company. * * *
“ Since 1934 the company has not distributed to the shareholders their one-eighth of the profits and, as a consequence, the undistributed profits approximate $300,000. This withholding of profits was done for the purpose of conserving the assets of the company. Counsel to the company believe that there is a strong possibility that the charter provision may be interpreted as creating a debt in favor of the shareholders for the undistributed profits. Since the company is faced with the necessity of strengthening ■ its reserves on life insurance and annuity contracts by the adoption of a lower interest assumption, it would adversely affect the interest of policyholders to make a substantial cash payment amounting to as much as $300,000 to the shareholders. In order to guard against this prospect, the management proposes an increase in the guarantee capital of $300,000 to be issued to the shareholders and the 7% annual interest payment to the holders of guarantee capital which is required by the charter shall be scaled down.
“ The proposed amendments are designed to provide the necessary statutory procedure in order to carry out the company’s proposal.
“ The Department urges favorable executive action on this measure.”
This initiated the succession of charter- amendments and increases in guarantee capital and guarantee capital shares, all of which were approved by the department to effectuate disposal of similar profit accumulations and to strengthen the position of the company and of its policyholders.
*364 From 1950 through 1967 the petitioner could have distributed about $9,000,000 in dividends to guarantee capital shareholders. However, it used $5,500,000 to increase deposit capital, strengthening the financial security of the policyholders and distributed to shareholders less than 40% of profits distributable to them. This additional reserve available for investment has increased investment income in which the policyholders share to the extent of seven eighths thereof. During that period and in the absence of increases in guarantee capital and guarantee capital shares the stockholders could have received a net additional $4,500,000 in cash profits over and above what they did receive in cash dividends and interest payments. The fund securing policyholders would have been reduced by a similar amount. The lifeblood of the business of the mutual insurance company is the capital available for investment and improved attractiveness for securing contracts in increasing numbers due to the higher ratio of surplus to reserve. That ratio increased in the period 1950 through 1967 from 4% to 7.58%. Had the additional capital been paid in cash the ratio would be 5.45%. The experience of this company resulting from the policies pursued compares favorably with the experience of other mutual insurance companies. It is fair to note, in addition, that pay-out in cash instead of increasing guarantee capital shares earning 3% interest and one eighth of net profits after payment of interest could well have enabled the shareholders to invest the cash pay-out to their better advantage.
It is notable that in 1950 the authorized capital was $100,000. It now stands at $6,000,000. During the 17-year period through 1967 admitted assets of the company have increased from $60,861,000 to $297,390,000 and its outstanding life insurance in force increased from $253,038,000 to nearly $2,500,000,000, while dividends paid to policyholders in 1950 amounted to $534,000 and in 1967 to $7,130,000.
Respondent argues that the continued increase in guarantee capital dilutes the policyholders’ voting power. Apart from the fact that the shareholders ’ voting power is frozen regardless of the number of guarantee capital shares issued the experience of mutual companies has been that a fraction of 1% of policyholders exercise the vote power. In addition it is argued that the additional shares are to earn 3% interest guaranteed and cumulated which would work to the disadvantage of the policyholders. To the contrary, as already indicated, the shareholders could use the cash pay-out to greater advantage and the ’ increased fund is available to the company for further investment and profits to the benefit of the policyholders. In *365 addition, the policyholder may borrow on his policy at a low rate of interest and invest it to his additional advantage. It is suggested that the past record of satisfactory earnings is not necessarily an assuring shield against future fluctuations in the economy. It appears, however, that company earnings over a period of decades have never fallen below 3%. It is further suggested that the shareholders now hold 3,000,000 shares while never investing more than the original $100,000 in capital. The observation is, to say the least, unimpressive, since it is obvious that the guarantee capital has increased from time to time because the shareholders have returned or left their cash benefits in the company, creating ever increasing potential of business and net profits available to the policyholders to the extent of seven eighths thereof. Thus, by capitalizing earnings available to shareholders additional support is given to existing policyholders and for further business expansion. Whatever benefits are realized by the shareholders cannot be and have not been shown to be detrimental to the interest of the policyholder. The history of the company’s record is entirely to the contrary. Further the undoubted disparity in vote power is, as a matter of experience, of minimal consequence, both because of the policyholders’ demonstrated lack of participation by their votes and the total failure to cast any fault on the company’s management since its inception in 1850. More significantly the reasons for the present desire to increase guarantee capital are no different from those which animated the seven prior approved applications for guarantee capital increase in the years 1950, 1951, 1952, 1953, 1955, 1961 and 1964. Whatever weight may be given to respondent’s contentions that the application is one purely of self-interest of the shareholders and to the detriment of the policyholders, it would seem that to support such a demonstration Would require a showing of some distinguishing factor between this application and the seven prior applications to avoid a conclusion that the department erred in those seven instances. But the rule of law is that prior actions of authorities taken in pursuance of power conferred should be given weight when judging their propriety and the action of the office of the Superintendent of Insurance in the past should be taken as supporting in the absence iof any showing of distinction. Finally, it would appear that it is respondent’s purpose to secure the retirement of all the guarantee capital shares. If their number were to be increased, reduction by retirement would be .rendered difficult to accomplish. It is not demonstrated, however, that *366 the power resides in the respondent to accomplish that purpose since the petitioner’s public shareholders enjoy the protection of rights vested by the legislation adopted in 1849 and 1950 (see Matter of Northwestern Nat. Ins. Co. v. Pink, 262 App. Div. 216, affd. 288 N. Y. 359).
The motion is granted.